Daniel R. Levy, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
dlevy@ebglaw.com

Counsel for Plaintiff,
*Samsung Electronics America, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> LILLIAN CELONA; ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names and unidentified individuals), <br><br> Defendants. | Civil Action No. <br><br><br> **<u>VERIFIED COMPLAINT</u>** |

Plaintiff, SAMSUNG ELECTRONICS AMERICA, INC. ("SEA" or the "Company"), by and through its undersigned counsel, files this Verified Complaint against Defendant, LILLIAN CELONA ("Celona" or "Defendant"), and in support thereof avers as follows:

### <u>Summary of Action</u>

1.     This action arises out of the conduct of Defendant Celona, a former SEA employee who recently resigned from SEA and who SEA learned, despite Celona's statements to the contrary, immediately commenced employment with Midea America Corp. ("Midea"), SEA's

direct competitor in the home appliance and electronics marketplace, brazenly misappropriated SEA's trade secrets and confidential information, and has already solicited at least one SEA customer, all in violation of SEA's Confidentiality, Non-Competition, and Non-Solicitation Agreement (the "Agreement") that Celona executed upon a promotion in March 2024. A true copy of the Agreement is attached hereto as Exhibit 1 (with salary and compensation information redacted). After misrepresenting her intentions to join Midea and taking SEA's Confidential Information, Celona then ignored at least three requests by SEA seeking her cooperation.

2.      In seeking to enforce its restrictive covenants, SEA seeks to stop Celona from working in a role at Midea that is essentially the same or a substantially similar position to the one she held at SEA, namely in a role in which she has responsibility for maintaining business relationships and marketing, as well as involvement in pricing and customer relationships in the home appliance space.

3.      Celona's decision to accept employment with Midea in a competitive role is a clear violation of the noncompete provision in the Agreement, in which she agreed to refrain from providing services for an SEA competitor for a period of six-months after resigning from SEA.

4.      Equally concerning to SEA is that Celona continues to possess SEA's confidential information and trade secrets in violation of the confidentiality and return of property provisions in the Agreement. Specifically, prior to tendering her resignation - ostensibly while engaged in discussions with Midea about potential employment - Celona forwarded to her personal e-mail account a file containing a multitude of SEA trade secrets and confidential information. Such information included but was not limited to, information regarding SEA's products, sales data, pricing information, and business strategies.

2

5.     Beyond working for Midea in a competitive role and exfiltrating highly confidential SEA information, SEA has learned that Celona has also solicited at least one SEA customer to reduce its business with SEA and provide business to Midea in violation of the customer non-solicitation provision in the Agreement.

6.     Despite SEA's repeated efforts to obtain the return of its trade secrets and other confidential information that Celona took from SEA shortly before her resignation from the Company, Celona has refused to cooperate with or return the files and/or property to SEA. Indeed, Celona has completely ignored multiple letters and e-mails from both in-house and outside counsel for SEA, as well as SEA's Security and Investigation department. True and accurate copies of these letters and communications are attached hereto as Exhibit 2, Exhibit 3, and Exhibit 4.

7.     In order to protect its business interests, SEA asks that Celona be ordered to comply with all post-separation obligations duly owed to SEA, and notably, (i) immediately stop working in a position that requires her to work in home appliances for the next six months in violation of her noncompete; (ii) stop soliciting SEA customers in violation of her non-solicitation covenants; and (iii) return and/or destroy any SEA confidential information in her possession, custody, or control, submit her storage devices and e-mail/cloud accounts to a forensic inspection by a neutral third-party forensics company, and identify any person or entity with whom Celona shared any SEA confidential information.   Thus, in addition to ultimate relief, SEA seeks immediate temporary and preliminary relief.

**Jurisdiction and Venue**

8.     Jurisdiction is based on 28 U.S.C. § 1331 and SEA's claims under 18 U.S.C. 1836(b), for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016.

9.     This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 of all other claims that do not arise under the Constitution, laws, or treaties of the United States.

10.    Venue is proper within this district based on 28 U.S.C. § 1391 in that Celona agreed that any action or proceeding between SEA and Celona "shall be brought exclusively in the state or federal courts of the State of New Jersey, and [Celona] hereby expressly consents and submits to the personal jurisdiction thereof."  (Exhibit 1, at ¶ 22).

## Parties

11.    SEA is a corporation duly organized under the laws of the State of New York and maintains its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

12.    SEA sells leading-edge electronic products to retailers and directly to end users, including, among others, consumer electronics, IT and mobile communications, device solutions, home appliances, and television and home theater.  SEA maintains approximately 31 offices in the United States, three of which are located in New Jersey.

13.    SEA provides groundbreaking connected experiences across its large portfolio of products and services, including mobile devices, home appliances, home entertainment, 5G networks, and digital displays.

14.    Through SEA's Home Appliance Division (now internally referred to as "Digital Appliance" or "DA" within the SEA organization), SEA engages in the sales and marketing of home appliances throughout the United States.

15.    SEA's Home Appliance Division encompasses a wide range of products, including but not limited to, refrigerators, washing machines, and dryers.  SEA's success in home appliances,

which is a highly competitive field, is based in large part on its ongoing commitment to innovation and customer satisfaction, offering products that incorporate cutting-edge technology and customer-friendly features obtained through SEA's marketing and strategy efforts.

16.    Defendant Celona is an individual who, upon information and belief, currently resides in Hoboken, New Jersey.

17.    Defendant Celona's current employer is Midea, a company with its principal place of business located in Parsippany, New Jersey that sells a variety of home appliances.

18.    SEA and Celona's current employer, Midea, are direct competitors. Both SEA and Midea are engaged in the sales and marketing of home appliances. Midea's appliance product portfolio includes laundry, refrigerators, ovens, dishwashers, range hoods, and microwaves. SEA's Home Appliance Division portfolio also includes laundry, refrigerators, ovens, dishwashers, range hoods, and microwaves. Both SEA and Midea compete for the same market share, and are, therefore in direct competition with each other.

19.    Defendants ABC Corporations 1-5 and John Does 1-5 are fictitious names for any presently unknown corporation(s), partnership(s), business, entity, and/or person(s) who, at times relevant hereto, incited, aided, or abetted Celona in the breach of her restrictive covenants and misappropriation, threatened misappropriation, disclosure, and/or use of the SEA information.

## Celona's Employment History with SEA

20.    SEA employed Celona in various product marketing management positions within SEA's Home Appliance Division from approximately April 2021 through July 2025.

21.    During her employment with SEA, Celona had responsibility for product marketing of home appliances within SEA's Home Appliance Division throughout the entire United States.

Specifically, Celona had responsibility for increasing the sale of home appliances within SEA's Home Appliance Division, including most recently, the sale of SEA's Flagship Combination Product washer dryer machines ("Flagship Combo Product").

22.    In or about April 2021, SEA hired Celona as a Professional II, Product Management with the title of Associate Product Marketing Manager.

23.    In or about March 2022, SEA promoted Celona to the position of Professional III, Product Management, with the title of Product Marketing Manager.

24.    Celona held the Product Marketing Manager role for about two years until her February 2024 promotion.   In this role, Celona was responsible for the comprehensive management of sales strategy concerning various home appliance product lines, including (i) management of business sales and profit & loss information, (ii) management of SKU rationalization and inventory aging, (iii) management of product launch planning for new models, (iv) management of regional retailer customer accounts, and (v) management of "Shopper Sentiment" and warranty issues to support consumer services.

25.    In February 2024, SEA informed Celona that she was being promoted to the position of Senior Professional I, Product Management, with the title of Senior Manager.

26.    On February 26, 2024, in consideration for her promotion and continued employment, Celona executed the Agreement. (Exhibit 1).

27.    Celona received a significant pay increase as a result of this promotion.

28.    Celona held the position of Senior Professional I, Product Management from approximately March 1, 2024 until her voluntary resignation from SEA on July 9, 2025.

29.     In her promoted role as Senior Professional I, Product Management, Celona held the title of Senior Manager and, in addition to her ongoing responsibilities as a Product Manager, the expanded role included responsibilities for (i) managing future and short-term innovation plans for the sale strategies of various product categories and (ii) serving as a lead for the customer account of a national retail channel.

30.     During approximately the last three months of her employment at SEA, Celona was primarily responsible for the Laundry business unit.

31.     In all of her positions at SEA, Celona was responsible for customer-facing business needs, and she had ongoing responsibilities to discuss product launches and other product information with SEA customers and partners, including but not limited to, having responsibilities for increasing the sale of home appliances within SEA's Home Appliance Division, managing pricing structures and profit and loss information, and directly handling sales strategies and flooring needs across several SEA customer accounts, including national and regional retail channels.

32.     At the time of her separation, Celona's role also included product management responsibilities for laundry product lines, and Celona was specifically responsible for SEA's Flagship Combo Product.

### Celona's Resignation: Misleading Statements and Wrongful Misappropriation of SEA Confidential Information and Trade Secrets

33.     On or about June 25, 2025, Celona notified SEA of her voluntary resignation of her employment with SEA, effective July 9, 2025.

7

34.    On June 25, 2025, Celona provided her verbal notice of resignation to her manager, Yongho Park, Director of Home Appliance, Product Marketing.  Consistent with internal policies, SEA twice asked her about her plans for future employment, and Celona represented to SEA that she had not accepted any subsequent employment, let alone employment with Midea or any other competitor of SEA.

35.    After Celona left SEA, however, on July 22, 2025, several SEA employees witnessed Celona in attendance at the National Alliance of Trade Merchants' (NATM) Vendor Conference in Texas, and it appeared to the SEA employees that Celona approached SEA customers on behalf of SEA's direct competitor, Midea.

36.    Upon learning that Celona was suspected to be working for a competitor, SEA promptly opened an investigation into Celona's conduct and whereabouts, including her computer activity in the weeks leading up to her voluntary resignation.  Upon review of Celona's email activity, SEA discovered that Celona had secretly, without authorization and in violation of company policy and her legal and contractual obligations, transferred to her personal Gmail account and taken from SEA at least one large Excel file that includes SEA's highly confidential and proprietary information and trade secrets.  SEA learned that Celona's misappropriation took place shortly before she notified SEA of her intention to resign, ostensibly while she was discussing potential and/or had already accepted actual employment with Midea.

37.    Specifically, on or about May 21, 2025, Celona transferred to her personal e-mail account a file labeled "LG_tasklist.xlsx" that contains a compilation of SEA confidential and proprietary information.  The file contains extensive amounts of SEA data, including, among other things, highly confidential information regarding SEA's products, sales data, pricing information,

and business strategies. In essence, the file contains a task list, or roadmap, for SEA's business strategies in this competitive space (hereinafter the "Roadmap File").

38.    Specifically, the Roadmap File contains highly confidential information relating to SEA's Home Appliance Division, including but not limited to SEA's: (a) profit information and pricing structure; (b) Laundry Flooring File that contains SEA's sales information with national retailers; (c) highly confidential pricing information across SEA's laundry products; and (d) competitive information in light of the current tariff challenges facing all companies in this space.

39.    The Roadmap File also contains sales information relating to SEA's Flagship Combo Product that was released only a short time prior to Celona's voluntary resignation from SEA.

40.    All unpublished information, including sales information, relating to the Flagship Combo Product is highly confidential and could be extremely damaging in the hands of a competitor such as Midea, who markets a competitive product.

41.    The Roadmap File taken by Celona would provide invaluable competitive information to any skilled third party in the field, particularly a direct competitor such as Midea.

42.    The information contained in the Roadmap File would provide a competitor such as Midea with sales and pricing information to outbid SEA, including with respect to SEA's current customers and provides Midea with a competitive edge with respect to the laundry business and responding to the national tariff challenges.

43.    Celona's possession of SEA's trade secret information is particularly troubling to SEA given that Celona misrepresented to SEA that she had not accepted any alternate employment

with a competitor of SEA, but in reality, she accepted employment with Midea, SEA's direct competitor.

44.    As of August 28, 2025, Celona has not updated her LinkedIn profile to identify Midea as her new employer.  A copy of Celona's current LinkedIn profile, as of August 28, 2025, is attached hereto as Exhibit 5.

**SEA's Efforts To Protect Its Confidential And Proprietary Information**

45.    All SEA unpublished information about its products, sales data, business operations, pricing strategies, and business strategies related to SEA home appliances are SEA trade secret information.

46.    SEA's confidential and proprietary information—and specifically, the information contained in the Roadmap File stolen by Celona—is not generally known outside of SEA.

47.    Most of the information contained in the Roadmap File is not readily ascertainable from any source of public information; indeed, the *only* source of the stolen trade secrets and the information therein is held by SEA.

48.    SEA's competitive position relies upon continually enhancing product development and marketing efforts that are founded on confidentiality and protection of intellectual property in a highly competitive field.

49.    SEA has in place policies, procedures, and systems that protect its confidential information from disclosure to others and from use by anyone for purposes other than in SEA's interest.

50.    SEA's computer network is protected by multiple layers of required authentication to access its shared drives and documents.

51.     When employees log into the SEA network in the office, users connect to SEA's secure network and must first log into SEA's internal platform before being able to access functions such as email and network drives, as well as another separate authentication to access files saved locally on the hard drive.

52.     When employees log in from remote locations, an additional layer of security is added by the required use of SVPN, which includes multi-factor authentication, to use a Samsung-issued device.

53.     In addition to the Agreement with Celona that contains confidentiality and non-disclosure obligations, all SEA employees are required to sign a Security Pledge as a condition of employment.  A true copy of the Security Pledge executed by Celona is attached as Exhibit 6.

54.     Further, SEA maintains policies and procedures concerning information and data security that state, in relevant part, that only the software provided and installed by SEA is allowed on employee computers, and that data and information on the SEA computer network are proprietary and confidential.

55.     SEA employees are reminded of these policies when they sign into SEA's systems and network, as reflected in messages such as this one:

**Security Reminder for SVPN**

I will use Samsung's resources and systems for work-related purposes only.

I will not use Samsung's resources and systems for my own personal benefit .

I will not disclose business, financial, strategic, customer, employee or any other confidential or proprietary information, including trade secrets.

I will not allow any other person to use my SVPN Service to access Samsung systems.

I will use the lastest updated anti-virus on my PC.

## Let's access SVPN

First, read the Security Reminder for SVPN. Then click 'Access' button to connect SVPN.

56.    Further, to the extent that confidential information existed in written paper form, such writings were kept in secured areas with limited access.

57.    Guests to any SEA facility are not allowed to venture unescorted into such secure areas or to access SEA confidential information unless they or their employer have executed appropriate non-disclosure agreements with SEA.

58.    SEA has in place electronic systems that monitor activity, such as the transferring of files and information from its computers to other accounts or portable devices.

59.    SEA prohibits the use of removable media devices to prevent the transfer of SEA confidential information to such removable media devices.

60.     One security measure involves a Data Loss Prevention application (hereinafter the "DLP application") placed on endpoints, such as desktops, laptops, and on cloud-based environments such as Microsoft 365.

61.     The DLP application is used as part of SEA's ongoing efforts to assure the security of SEA data, systems and information.

62.     The DLP application develops a report of the name and date in which any SEA employee electronically copies information to another account.

63.     SEA's Information Security Department actively monitors the DLP application in an effort to determine whether SEA employees are downloading or otherwise transferring SEA trade secrets or Confidential Information.

64.     SEA requires its employees to regularly complete web-based security and confidentiality training to remind employees of their obligation not to use or disclose to any third party any SEA trade secrets or confidential information.

## Celona's Obligations Under The Agreement with SEA

65.     As part of SEA's efforts to protect its confidential information and trade secrets, and in connection with Celona's access to the Company's confidential information as a result of her promotion, SEA presented Celona the Agreement, which she executed on February 26, 2024.

66.     Pursuant to the Agreement, Celona agreed that, once her employment with SEA ended, she would immediately deliver to the Company all Confidential Information in her possession or under her control.  (Exhibit 1, at ¶ 5).  The Agreement defines "Confidential Information" as:

13

[A]ny proprietary or business-sensitive information, which is not generally known to the public and which, if released to unauthorized persons, would be detrimental to the business interests of the Company, its affiliates or parties with which it does business, or would permit such unauthorized persons to improperly benefit. Employee and the Company agree Confidential Information includes but is not limited to: (i) financial information, including, without limitation, product and service cost data, revenue and profit margins; (ii) customer information, including but not limited to customer/client names, telephone numbers, addresses, any compilations of past, existing or prospective customers, customer proposals or agreements, status of customer accounts or credit, customer needs or related information about actual or prospective customers; (iii) information of third parties in the possession of the Company which the Company is obligated to maintain in confidence; (iv) supply and/or service information; (v) pricing information (vi) business and marketing information, including, without limitation, information relating to legal and regulatory matters, project proposals, financial data, accounting work sheets, marketing studies, construction plans, contemplated new ventures, customer information, unannounced future products and strategies, existing and planned Company and customer network configuration and design, and customer specific and billing information; (vii) production information; (viii) merchandising systems and/or plans; (ix) business operations information; (x) any formula, pattern, device and/or compilation of information which is used in the company's business and which gives the Company an advantage over its competitors; (xi) information relating to the Company's employees, including but not limited to, salary information, job duties and responsibilities, and related personnel information; (xii) specialized training; and (xiii) Trade Secrets as described above. The Company will provide Employee with access to, and Employee agrees to use, Confidential Information to the extent necessary for Employee to perform Employee's job functions, during the term of Employee's employment. Employee recognizes that such Confidential Information is the property of the Company, and Employee shall not disclose to others (except as required in Employee's duties to the Company), nor will Employee use for Employee's or another's benefit any such Confidential Information, either during Employee's employment with the Company or thereafter.

(*Id.* at ¶ 4).

67.     Celona also agreed that she would not "take any" records, reports, data, memoranda, notes, models, or equipment, or copies or reproductions thereof that relate to the

14

business activities of the Company.  She agreed that if she stored any Confidential Information or Trade Secrets (as defined in Section 3 of the Agreement) on any "personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo)," she "**must tender those devices to the Company to have the data removed and/or have complete copies of the medium and all information stored**."  (*Id.* at ¶ 5) (emphasis added).

68.    Celona agreed that for a limited period of only six (6) months following her departure from SEA, she would not accept employment for any Competitor of SEA performing the same or substantially similar job duties or responsibilities that she performed for SEA or any duties or responsibilities that would require her to use or disclose SEA Confidential information. (*Id.* at ¶ 12).

69.    Specifically, Celona agreed in the Non-Competition provision as follows:

> Employee acknowledges the Company is engaged in a specialized business involving highly sensitive information, and but for Employee's employment with the Company, Employee would not have had access to the Company's Trade Secrets and Confidential Information (as those terms are defined above), and to the Company's customer contacts and/or customer information during the course of Employee's employment with the Company. Employee acknowledges that the Company has also invested a great deal of time and money in developing relationships with its customers. Employee agrees that during the course of Employee's employment and for a period of six (6) months after the termination of Employee's employment with the Company for any reason, Employee shall not, directly or indirectly, enter into, own, manage, operate, control, be associated with, or engage, as an employee, associate, officer, director, shareholder, partner or in any other capacity for any Competitor of the Company's in the United States performing the same or substantially similar job duties or responsibilities that Employee performed for the Company or any duties or responsibilities which would require Employee to use or disclose Confidential information. For purposes of this Agreement, "Competitor" means any entity, including, but not limited to, a corporation, limited liability corporation, partnership, individual or sole proprietorship that sells, offers to sell, advertises, markets, manufactures, produces or

distributes products or services directly or indirectly in the business and/or markets of any Division of the Company in which Employee worked or had significant dealings during his employment with the Company.

(*Id.*)

### Joining Midea Violates Celona's Non-Competition Obligations

70.    A review of Midea's home page reveals all of its home appliances products, and refrigerators is the first category of product:



(*See*    https://www.midea.com/us    (last    viewed    Aug.    26,    2025);    *see    also* https://www.midea.com/us/refrigerators (last viewed Aug. 26, 2025)).

71.    Midea also sells and markets laundry appliances:



72.     Notably, Midea also sells and markets a washer-dryer combination model that mirrors SEA's Flagship Combo Product in purpose and function.  Midea's washer and dryer combo model is a single machine capable of both washing and drying laundry.  This product is in direct competition with SEA's All-in-One Washer Dryer Combo, a single machine capable of both washing and drying laundry, also referred to as the Flagship Combo Product, which fell under Ms. Celona's direct responsibilities at SEA. (*See* https://www.midea.com/us (last viewed Aug. 26, 2025); *see also* https://www.midea.com/us/laundry (last viewed Aug. 26, 2025)).

73.     It is unquestionable that Midea and SEA are direct competitors in the home appliance space, and more specifically, they directly compete with one another in the refrigerator and laundry markets.

74.     Celona is prohibited from working for Midea in the same or similar position she held while employed at SEA.  (*See* Exhibit 1, at ¶ 12).  The Agreement prohibits her employment with Midea in the area of home appliances for a period of six months.  Celona's role at Midea violates this provision of the Agreement.

**Soliciting SEA Customers On Behalf of Midea Violates Celona's
Non-Solicitation Obligations**

75.     Celona also agreed that for a period of six (6) months following her departure from SEA, she would not solicit, or assist any of the Company's competitors (such as Midea) in soliciting any current customer or customer account as of the date of her departure from the Company, with whom she had contact or access to Confidential information about during the last year of her employment with SEA.  (*Id.* at ¶ 13).

76.     The Non-Solicitation of Customers covenant states:

> Employee acknowledges that but for Employee's employment with the Company, Employee would not have had access to the Company's customers and/or its customer's information. Employee acknowledges that the Company has also invested a great deal of time and money in developing relationships with its customers. Employee agrees that during the course of Employee's employment and for a period of six (6) months after the termination of Employee's employment for any reason, Employee shall not, directly or indirectly, solicit on Employee's behalf or on behalf of any of the Company's competitors or potential competitors, or directly or indirectly, assist any of the Company's competitors or potential competitors in soliciting any current customer or customer account as of the date of termination of Employee's employment with the Company, with which Employee had contact or access to Confidential Information about during the last one (1) year of the Employee's employment with the Company.

(*Id.*)

77.     Despite these clear and reasonably tailored obligations, Celona has solicited SEA customers on behalf of Midea.

78.     Due to Celona's misrepresentation of her employment plans at the time she resigned from SEA, SEA did not know the identity of Celona's new employer.

79.     However, on or about July 22, 2025, SEA employees witnessed Celona at the NATM Vendor Conference, an industry event in Texas, and it appeared to the SEA employee that Celona was attending the event on behalf of Midea.

80.     Additionally, SEA subsequently learned that Celona, in violation of the customer non-solicitation provision of her Agreement, had contacted at least one existing SEA customer to solicit that client in furtherance of doing business with Midea (hereinafter "Customer 1").

81.     As part of her responsibilities for SEA's laundry business unit, Celona had responsibility for supporting sales accounts with Customer 1.

82.     Customer 1 is a regional retailer and a mutual customer of both SEA and Midea. Celona's solicitation of Customer #1 shows that she is working on similar products and customers that she had responsibility during her employment at SEA, to the detriment of SEA's interests and in direct competition with SEA's business.

**Celona's Breach of Confidentiality Obligations**

83.     As a result of her Senior Professional I, Product Management position, Celona had access to SEA Confidential Information relating to its Home Appliance Division, including but not limited to, confidential customer contact information, product information, product marketing information, sales data, and business strategies.  Celona also had access to SEA product information, including SEA product improvements in the Home Appliance Division and specific action items being addressed with national retailers in support of such improvements.

19

84.     The information that Celona had access to during her employment with SEA constituted trade secrets under federal and state law.

85.     As set forth in detail above, SEA discovered that shortly before giving notice of her resignation, Celona transferred to her personal Gmail account, ljgiannoglou@gmail.com, the Roadmap File, which contains SEA's Confidential Information and Trade Secrets.

86.     In its essence, the Roadmap File taken by Celona shortly before her voluntary departure from SEA contains a full task list, or roadmap, for sales and marketing in the competitive Home Appliance space.

87.     Upon information and belief, Celona transferred the Roadmap File to her personal Gmail account at about the same time she was in discussions with Midea about potential employment.  Her removal and retention of the Roadmap File constitutes a breach of her obligations under the Agreement and law.

**SEA's Efforts to Remediate Celona's Breaches of the Agreement and Legal Obligations Owed to SEA**

88.     Upon learning that Celona was seen at the NATM Vendor Conference on behalf of Midea and learning about her unauthorized transfer of SEA Confidential Information and Trade Secrets, on August 1, 2025, SEA sent a letter to Celona demanding that, among other things, she immediately return to SEA all SEA property in her possession, custody, or control, and confirm in writing her employment status, including identification of her current employer, job title, and nature of her job duties.  A true copy of SEA's August 1, 2025 letter to Celona is attached hereto as Exhibit 2.

89.    SEA demanded that Celona respond to its letter no later than August 6, 2025.  *See id.*

90.    Celona did not respond to SEA's August 1, 2025 letter.

91.    SEA also sent a letter to Midea regarding Celona's contractual and legal obligations to SEA, and SEA requested that Midea, among other things, confirm in writing the status of Celona's affiliation with Midea, including her job title and job duties, and to confirm that Midea will not take any action to encourage Celona to breach any obligations to SEA.  A true copy of SEA's August 1, 2025 letter to Midea is attached hereto as Exhibit 7.

92.    SEA also demanded that Midea respond by August 6, 2025.  *See id.*

93.    Midea did not respond by the August 6, 2025 deadline, but Midea did respond via letter dated August 11, 2025.  A true copy of Midea's August 11, 2025 letter to SEA is attached hereto as Exhibit 8.

94.    Although Midea's August 11, 2025 letter did not adequately address many of SEA's concerns regarding Celona, Midea did confirm that Celona commenced employment with Midea effective July 21, 2025 as Midea's Senior Manager for Regional Sales.  *Id.* Midea also stated that Celona's job was solely to serve an existing Midea account and represented that she had not solicited any SEA customers or otherwise violated the Agreement.

95.     Having not received any response to SEA's August 1, 2025 letter, on August 16, 2025, SEA's counsel sent a follow-up letter to Celona.  A true copy of SEA's August 16, 2025 letter to Celona is attached as Exhibit 3.

96.    SEA demanded, among other things, that Celona provide the following information no later than August 19, 2025: (a) a detailed written description of all duties, projects, deliverables,

21

meetings, and client-facing activities Celona has performed or is expecting to perform during the next six months for or on behalf of Midea; and (b) a written list of every SEA client/customer/prospect Celona has contacted, spoken with, solicited, supported or assisted since leaving SEA, with dates of contact, modes of contact, and subject matter of discussion. *Id.*

97.     On August 16, 2025, SEA also sent another letter to Midea. A true copy of SEA's August 16, 2025 letter to Midea is attached as Exhibit 9.

98.     SEA requested that Midea provide the following information no later than Tuesday, August 19, 2025: (a) a written job description and offer letter that sufficiently describes Celona's duties and responsibilities with Midea; (b) a written list of all customers and potential customers Ms. Celona has called upon while employed at Midea; (c) written confirmation that Midea has searched its computer network, as well as Celona's work-computer and work e-mail account for the Roadmap File; and (d) written assurances that Midea will meet and confer with the undersigned to address any remaining issues and concerns regarding Ms. Celona's restrictive covenant obligations. (*Id.*)

99.     Even though SEA demanded a response by August 19, 2025, Midea did not respond until August 22, 2025, in response to which its outside counsel stated only that it was "looking into the issues you raised and will get back to you shortly." A true copy of Midea's counsel's e-mail is attached as Exhibit 10.

100.     To date, and despite repeated requests to Midea's counsel, Midea has not provided the information that SEA requested. On August 27, 2025, however, Midea's counsel informed SEA's counsel that Celona had been placed on leave. *See id.*

**SEA's Ongoing Efforts To Have Celona Return The Stolen Information To The Company**

101.    With respect to SEA Confidential Information, SEA's August 1, 2025 letter demanded that Celona: (a) immediately return to SEA all property in her possession, including electronic devices, documents and information, whether in hard copy of electronic format; (b) preserve all personal electronic devices, personal email account, or any other storage medium or account that may contain SEA confidential or proprietary information; and (c) confirm in writing that she has not disclosed any SEA confidential or proprietary information or documents to any third parties, including Midea, or if she has disclosed SEA confidential or proprietary information to any third party, to identify all third parties to whom she disclosed such information or documents.  (Exhibit 2).

102.    Also on August 1, 2025, Ricky Hendrix, Senior Manager of SEA's Security and Investigations Team, sent an e-mail to Celona requesting that she provide a "complete inventory" of all SEA "documents, digital and otherwise, that you currently have in your possession."  Mr. Hendrix's email provided Celona with detailed instructions on how to provide SEA with the complete inventory.  A true copy of Mr. Hendrix's August 1, 2025 email is attached as Exhibit 4.

103.    Celona did not respond to SEA's August 1, 2025 letter or Mr. Hendrix's August 1, 2025 e-mail.

104.    Having ignored both August 1 communications from her former employer, on August 16, 2025, SEA's outside counsel sent a letter to Celona regarding her continued possession of SEA Confidential Information and Trade Secrets.  (Exhibit 3).

105.    In addition to demanding information regarding her noncompete and non-solicitation obligations (as outlined in Paragraph 96, above), SEA also demanded that, by August

19, 2025, Celona: (i) return the Roadmap File and all other SEA property and information in her possession; (ii) identify all locations where SEA information that is in her possession resides or has ever resided; and (iii) reminding Celona that her obligation to return SEA property extends to records, files, reports, data, memoranda, notes, drafts, models, equipment, and other materials prepared or acquired in the course of Celona's employment at SEA.  (Exhibit 3).

106.    To date, Celona has not responded to SEA's multiple attempts to obtain her cooperation to return the SEA information that she took prior to her voluntary resignation from SEA.

107.    Thus, Celona has failed to comply with SEA's reasonable demands for the remediation of the SEA Confidential Information that she stole from SEA prior to her departure.

108.    Celona has also failed to comply with SEA's reasonable demands regarding her violations of the noncompete and customer non-solicitation provisions of her Agreement.

109.    SEA has engaged in good faith efforts to resolve this matter without judicial intervention, but Celona's dishonesty and refusal to cooperate gives SEA no choice but to file this lawsuit seeking to compel Celona to: (a) comply with her non-compete obligations under the Agreement; (b) comply with her non-solicitation obligations under the Agreement; and (c) remediate the misappropriated information and to discover whether she transferred the information to any third party, including but not limited to, Midea.

**Celona's Actions Will Cause Irreparable Harm**

110.    Celona agreed that if she violated the Non-Competition provision contained in Section 12 of the Agreement, the Non-Solicitation of Customers provision in Section 13 of the Agreement, or the Non-Solicitation of Employees and Independent Contractors provision in

Section 14 of the Agreement, "**the restrictive period provided for shall be increased by the period of time from the commencement of any such violation until the time such violation shall be cured**." (*Id.* at ¶¶ 12-14) (emphasis added).

111.    Celona acknowledged that the covenants are "reasonably necessary to protect the goodwill, Confidential Information, Trade Secrets, and other business interests of the Company[,]" and that the restrictive covenants "are essential and material elements of this Agreement and the Company would not have entered into this Agreement, hired, continued to employ, and/or promoted Employee without those covenants being included in this Agreement[.]"  (*Id.* at ¶ 15).

112.    Celona acknowledged that she had the opportunity to consult with legal counsel prior to executing the Agreement.  (*See id.*)

113.    Pursuant to Section 15 of the Agreement, Celona acknowledged and agreed that "any breach of the covenants contained herein will cause the Company immediate irreparable harm for which injunctive relief would be necessary[,]" and that in the event of any violation or attempted violation of the restrictive covenants, SEA "shall be entitled to a temporary restraining order, temporary or permanent injunctions, and other injunctive relief."  (*Id.*).

114.    SEA is, and will continue to be damaged by, Celona's violation of the non-compete and non-solicitation obligations under the Agreement, as well as her retention of SEA's valuable trade secrets and confidential information, and the ongoing threat of its use and disclosure for Celona's purposes or those of some third party, including Midea.

115.    If Celona is not required to abide by her legal obligations to SEA, the damages that SEA will sustain can never be fully compensated by an award of money damages alone.

25

116.    In particular, the loss of revenue, good will and competitive advantage that SEA will suffer due to Celona's violation of her non-compete and non-solicitation obligations, as well as her removal, use, or disclosure of SEA trade secrets and confidential information is inherently uncertain and can never be fully calculated.

117.    If a restraining order is not issued requiring the immediate compliance with the non-compete and non-solicitation provisions of the Agreement, then Celona would have obtained the benefit of increased compensation from SEA and access to SEA's Confidential Information and Trade Secret Information, and then unfairly compete with SEA in violation of the Agreement, causing SEA to suffer irreparable harm.

118.    If a seizure order is not issued requiring the recovery of all files taken from SEA, then Celona will continue to possess SEA's trade secrets and confidential information and threatens to unfairly compete with SEA by utilizing, or providing to others to utilize, SEA's trade secrets and confidential information that were developed and nourished at the cost and expense of SEA, causing SEA to suffer irreparable harm.

119.    If a seizure order is not issued requiring the forensic examination of Celona's personal and work e-mail accounts, then Celona will continue to possess SEA's trade secrets and confidential information and threatens to unfairly compete with SEA by utilizing, or providing to others to utilize, SEA's Confidential Information and trade secrets that were developed and nourished at the cost and expense of SEA, causing SEA to suffer irreparable harm.

120.    If Celona is not enjoined from breaching her legal obligations to SEA, she threatens to compete unfairly with SEA by utilizing, or providing to others to utilize, that confidential

information and those trade secrets that were developed and nourished at the cost and expense of SEA, causing SEA to suffer irreparable harm.

121.    The use by Celona or by any other third party with whom Celona shares SEA's Confidential Information and trade secrets, including Midea, will make it impossible for SEA to compete in the marketplace with the same competitive advantage as prior to Celona's misappropriation of SEA's Confidential Information and trade secrets.

122.    The continued violation of Celona's non-compete and non-solicitation obligations will make it impossible to determine the full extent of SEA's damages because it can never be fully known whether future loss of revenue and/or business by SEA was the result of a competitor's experience in the marketplace or because of the illegal and unfair competition and solicitation by Celona.

123.    Moreover, it will be impossible to determine the full extent of SEA's damages because it can never be fully known whether future loss of revenue and/or business by SEA was the result of a competitor's experience in the marketplace or because of the illegal use by them of SEA's trade secrets and/or confidential information.

## FIRST CLAIM FOR RELIEF

### (Breach Of Contract – Non-Competition)

124.     SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

125.     The Agreement is a valid and enforceable contract entered into between SEA and Celona.

126.     SEA has performed all of its duties and obligations under the Agreement.

127.     Celona has materially breached the Non-Competition covenant of the Agreement by commencing competitive employment with Midea – a direct competitor of SEA – in the same or substantially similar position to the positions she held at SEA.

128.     Celona's breach of contract has caused, and will continue to cause, SEA to suffer substantial injury that cannot be calculated, and irreparable harm to its business as she specifically acknowledged and agreed.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Non-Solicitation of Customers)

129.     SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

130.     The Agreement is a valid and enforceable contract entered into between SEA and Celona.

131.     SEA has performed all of its duties and obligations under the Agreement.

132.     Celona has materially breached the Non-Solicitation Of Customers covenant contained within the Agreement by actively seeking to take away SEA's customers and have them

become Midea customers, while at the same time improperly possessing SEA's confidential information relating to SEA's products, sales data, business operations and business strategies, among other things.

133.    Celona's breach of contract has caused, and will continue to cause, SEA to suffer substantial injury that cannot be calculated, and irreparable harm to its business as she specifically acknowledged and agreed.

## THIRD CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act of 2016)

134.    SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

135.    SEA owns and possesses certain confidential, proprietary and trade secret information, as alleged above.

136.    This confidential, proprietary and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

137.    SEA has taken reasonable measures to keep such information secret and confidential.

138.    This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

139.    In violation of SEA's rights, Celona misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

140.    The trade secret information accessed and stolen by Celona includes (but is not limited to) the information contained within the file identified in Paragraphs 37-43 and 85-86, above.

141.    Celona's misappropriation of the confidential, proprietary and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

142.    If Celona's conduct is not remedied, and if Celona is not enjoined, Celona will continue to misappropriate, disclose, and use for her own and potentially SEA's competitors' benefit and to SEA's detriment, SEA's trade secret information.

143.    As the direct and proximate result of Celona's conduct as aforesaid, SEA has suffered and, if Celona's conduct is not stopped, SEA will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

144.    Because SEA's remedy at law is inadequate, SEA seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. SEA's business is reliant on its business reputation and its ability to maintain clients in a competitive market and will continue suffering irreparable harm absent injunctive relief.

145.    SEA has a substantial likelihood of success on the merits because of Celona's blatant, willful, deceitful and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets in Violation of the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1 *et seq.*)

146. SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

147. SEA owned and possessed certain confidential, proprietary and trade secret information, as alleged above.

148. SEA has taken reasonable measures to keep such information secret and confidential.

149. This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

150. This confidential, proprietary, and trade secret information was made accessible to Celona by virtue of her confidential employment relationship with SEA.

151. In violation of SEA's rights, and in breach of her contractual obligation to maintain secrecy, Celona misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein, in violation of N.J. Stat. Ann. § 56:15-1 *et seq*.

152. The trade secret information accessed and stolen by Celona includes (but is not limited to) the information contained in the file identified in Paragraphs 37-43 and 85-86, above.

153. Celona's misappropriation of the confidential, proprietary and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

31

154.    Celona's intentional and malicious intent to misappropriate SEA's confidential and trade secret information is further evinced by the fact that she has continually refused to cooperate with SEA's reasonable efforts for her to return the information that she transferred to her personal Gmail account.  The foregoing fact, combined with the fact that she misrepresented to SEA acceptance of an offer of employment by Midea, all indicate Celona's intent to use and/or disclose this confidential, proprietary, and trade secret information.

155.    Celona's continued possession of SEA's trade secrets places her in a position to use or disclose such information.

156.    The information taken by Celona would provide invaluable competitive information to any skilled third party in the field to use SEA's information to unfairly compete in a highly competitive market.

157.    Upon information and belief, Celona has engaged, and continues to engage, in the uncured misappropriation and unauthorized possession, use and/or disclosure of SEA's confidential, proprietary and trade secret information, in violation of her obligations under the Agreement.

158.    Upon information and belief, the proprietary, and trade secret information stolen by Celona will be disclosed to SEA's competitors, including but not limited to Midea, with knowledge of Celona's breach of her confidential obligations to SEA.

159.    If Celona's conduct is not remedied, and if Celona is not enjoined, she will continue to misappropriate, disclose, and use for her own benefit and to SEA's detriment, SEA's trade secret information.

160.    As the direct and proximate result of Celona's conduct as aforesaid, SEA has suffered and, if Celona's conduct is not stopped, SEA will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

161.    Because SEA's remedy at law is inadequate, SEA seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. SEA's business is reliant on its business reputation and its ability to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

162.    SEA has a substantial likelihood of success on the merits because of Celona's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

## FIFTH CLAIM FOR RELIEF

**(Breach of Contract – Trade Secrets, Confidential Information, and Return Of Property)**

163.    SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

164.    As a condition of her promotion with SEA, Celona agreed to a covenant of confidentiality to protect SEA's Confidential Information (as defined in the Agreement), Trade Secrets (as defined in the Agreement), and that she would immediately return to SEA all Confidential Information and Trade Secrets. *See* Exhibit 1, at ¶¶ 3-5.

165.    Celona agreed that she would not use or disclose any Confidential Information (as defined in the Agreement) for her or another's benefit either during her employment with the Company or any time thereafter.  *Id.* at ¶ 4.

166.    Celona agreed that she would "immediately upon termination … deliver to the Company all software, records, reports, data, memoranda, notes, models, drafts and equipment of any nature prepared or acquired in [Celona's] course of employment with the Company, including but not limited to all Confidential Information, which are in the possession of or under the control of [Celona]." *Id.* at ¶ 5.

167.    Celona also agreed not to take any software, records, reports, data, or other information that relates to the business activities of SEA. *See id.*

168.    Celona further agreed that if she did store Confidential Information or Trade Secrets on any personal email account (or any other personal device or account), she must tender those accounts or devices "to the Company to have the data removed and/or have complete copies of the medium and all information stored." *Id.*

169.    SEA performed all of its obligations pursuant to the Agreement.

170.    Celona breached the Trade Secrets, Confidential Information, and Return of Property covenants in the Agreement by accessing SEA's confidential and trade secret information and by transferring that information to her personal Gmail account shortly before her voluntary resignation from the Company.

171.    Additionally, Celona breached Section 5 of the Agreement by failing to return the stolen information.

172.    Celona's continued possession of SEA's Trade Secrets and Confidential Information places her in a position to use or disclose such information, particularly in light of the fact that she has recently accepted employment with Midea, who directly competes with SEA.

173.    As the direct and proximate result of Celona's conduct as aforesaid, SEA has suffered and, if Celona's conduct is not stopped, SEA will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

174.    SEA has been damaged by these breaches for which it seeks damages and injunctive relief as more particularly set forth below.

## SIXTH CLAIM FOR RELIEF

### (Breach of the Duty of Loyalty)

175.    SEA repeats and realleges the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

176.    As an employee of SEA, Celona had a duty of loyalty to SEA to act in SEA's interests.

177.    As an employee of SEA, Celona had a duty not to email to her personal Gmail account, SEA's confidential information while she was employed by SEA.

178.    As an employee of SEA, Celona had a duty to return and not disclose SEA's confidential information while she was employed by SEA.

179.    Celona breached the duty of loyalty she owed to SEA by stealing SEA's confidential information while still employed by SEA and using such information to her benefit and to the detriment of SEA.

180.    As an employee of SEA, Celona had a duty not to injure SEA's business.

181.    Celona breached the duty of loyalty she owed to SEA by stealing SEA's confidential information and then subsequently refusing to return SEA's confidential information after multiple attempts by SEA to retrieve its information.

182.    SEA has suffered damages proximately caused by Celona's breaches of her duty of loyalty.

183.    The motivation behind the breaches of Celona's duty of loyalty that she owes to SEA is her new employment with Midea and her goal of acquiring new clients for Midea, albeit while using information that Celona stole from SEA while she was employed by SEA.

184.    By the conduct described above and realleged, Celona violated those duties, and instead acted in her own interests and contrary to the interests of SEA.

185.    Her actions breached the duty of loyalty owed to SEA and have damaged SEA.

### SEVENTH CLAIM FOR RELIEF

**(Violation of the New Jersey Computer-Related Offenses Act)**

186.    SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

187.    On or about May 21, 2025, Celona purposefully or knowingly accessed the SEA computer system in an unauthorized manner in violation of the New Jersey Computer-Related Offenses Act (the "CROA").

188.    By exceeding her authorized access to SEA's computer network, and by taking SEA confidential and trade secret information, Celona violated the provision of the CROA that imposes liability on any party who purposefully or knowingly takes any data, data base, or computer program.

189.    By purposefully and knowingly accessing, transferring, and obtaining data comprised of highly confidential information regarding SEA's products, sales data, business operations and business strategies, among other things, Celona violated the provision of the CROA

that imposes liability on any party who purposefully or knowingly accessed and obtained any data from a computer system or computer network.

190.     SEA is entitled to an injunction under the CROA, which specifically provides that an enterprise alleging injury or loss may bring an action to enjoin actions causing damage. N.J.S.A. 2A:38A-5.

191.     SEA respectfully requests that the Court: (a) order that Celona immediately return to SEA all SEA information that she downloaded, transferred or otherwise took from SEA; (b) enjoin Celona from using any SEA information; (c) enjoin Celona from accessing, or attempting to access, SEA's system or any data contained therein; (d) enjoin Celona from providing any SEA information to any third party, including but not limited to Midea; and (e) enter judgment in favor of SEA against Celona.

192.     Additionally, as a result of Celona's conduct, SEA has incurred reasonable and necessary attorneys' fees.  As such, SEA respectfully requests that it be permitted to recover all costs, reasonable attorney fees and expenses, as provided by statute.

## EIGHTH CLAIM FOR RELIEF

### (Conversion)

193.     SEA repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

194.     Celona has intentionally and unlawfully exercised dominion over property owned by SEA, including but not limited to its confidential information and trade secrets.

195.     Celona's conduct constitutes a conversion of SEA's property contrary to New Jersey law.

37

196.    Celona's acts of conversion were committed willfully, knowingly, maliciously, and in conscious disregard of her legal obligations to SEA.

197.    Celona's conduct has caused SEA injury to its property and business.

198.    Because SEA's remedy at law is inadequate, SEA seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. SEA's business is reliant on its business reputation and its ability to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**WHEREFORE**, plaintiff SEA respectfully demands that this Court enjoin Celona from continuing the unlawful activities described above, and that this Court issue judgment as follows:

1.    Temporarily restraining Celona from engaging in any conduct in violation of the non-competition and customer non-solicitation covenants in her Agreement, including (without limitation): (i) competing against SEA by continuing employment with Midea in the same or substantially similar position that she held while employed at SEA; (ii) Celona's use of SEA's confidential information; and (iii) the solicitation of SEA's customers in violation of the Agreement;

2.    Preliminarily and permanently enjoining Celona from engaging in any conduct in violation of the non-competition and non-solicitation covenants in her Agreement, including (without limitation): (i) competing against SEA by continuing employment with Midea in the same or substantially similar position that she held while employed at SEA; (ii) Celona's use of SEA's confidential information; and (iii) the solicitation of SEA's customers in violation of the Agreement;

38

3.      An Order requiring that Celona provide to SEA any and all SEA documents or files in her possession or control, whether in hard copy or electronically stored;

4.      An Order requiring that Google preserve all electronic mail for any and all e-mail accounts owned by Celona (including ljgiannoglou@gmail.com) and that Celona be ordered to allow for a forensic review of each e-mail account and cloud storage account by an independent computer expert approved by the Court;

5.      Temporary, preliminary, and permanent injunctive relief restraining Celona from misappropriating or using SEA trade secrets;

6.      That Celona is temporarily, preliminarily and permanently:

     i)    restrained from keeping, retaining, transmitting, possessing or in any way using, disclosing or having continuing access to SEA documents or information;

     ii)   required to provide to SEA, and allow SEA to seize, freeze and examine any and all communications devices, computers or other electronic devices of Celona to assure that she is not keeping, retaining, transmitting, possessing or in any way using, disclosing or having continuing access to SEA documents or information and to determine with whom such documents or information have been shared or disclosed;

     iii)  required to provide SEA's or its designated agents access to, and the right to inspect, any and all computers or other electronic device that now contain or ever contained SEA's documents or information;

     iv)   required, other than as provided in subparagraph (v), to refrain from altering, discarding, destroying or otherwise changing any and all computers or other

electronic devices or email or other accounts or storage media of any kind or character that now contain or ever contained SEA's documents or information, and must preserve same for future inspection;

v) required to provide SEA, and SEA's counsel, with a document in a form acceptable to SEA and to any relevant Google e-mail account provider or Google storage provider authorizing the removal and deletion from such account or service any and all emails and attachments containing SEA documents or information;

8. Compensatory, consequential, and incidental damages;

9. Punitive or exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), N.J.S.A. § 56:15-4(b), N.C. Gen. Stat. § 1-539.2A, and/or other applicable law;

10. Reasonable attorney's fees and costs of suit pursuant to 18 U.S.C. § 1836(b), N.J.S.A. § 56:15-6, and/or other applicable statute or law;

11. For the immediate return of all SEA property taken, including any and all documents or other means of information storage containing SEA property and confidential information;

12. Pre-judgment and post-judgment interest on that award; and

13.    Such other and further relief as this Court deems equitable and just.

Dated:  August 28, 2025

By: ____/s Daniel R. Levy_____
Daniel R. Levy, Esq.
Epstein Becker & Green, P.C.
One Gateway Center, 13th Floor
Newark, NJ  07102
Phone: 973.642.1900 / Fax 973.642.0099
E-mail:      dlevy@ebglaw.com

Erik W. Weibust, Esq. (*Pro Hac Vice Application to be Submitted*)
Epstein Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, MA  02111
Phone: 617.603.1100 / Fax 617.249.1573
E-mail:      eweibust@ebglaw.com

Attorneys for Plaintiff
Samsung Electronics America, Inc.

## <u>CERTIFICATION UNDER L.CIV.R 11.2</u>

This matter in controversy is not the subject of another action pending in any court, or any

other pending arbitration or administrative hearing.


Dated:  August 28, 2025                         EPSTEIN BECKER & GREEN, P.C.


                                                By:  ___/s *Daniel R. Levy*_____
                                                Daniel R. Levy, Esq.
                                                Epstein Becker & Green, P.C.
                                                One Gateway Center, 13th Floor
                                                Newark, NJ  07102
                                                Phone: 973.642.1900 / Fax 973.642.0099
                                                E-mail:dlevy@ebglaw.com

                                                Erik W. Weibust, Esq. (*Pro Hac Vice Application to
                                                be Submitted)*
                                                Epstein Becker & Green, P.C.
                                                One Financial Center, Suite 1520
                                                Boston, MA  02111
                                                Phone: 617.603.1100 / Fax 617.249.1573
                                                E-mail:eweibust@ebglaw.com

                                                Attorneys for Plaintiff
                                                Samsung Electronics America, Inc.

## **VERIFICATION**

I, Yongho Park, hereby verify and certify under 28 U.S.C. §1746 to the following:

1.     I am the Director, Home Appliances, Product Marketing for Samsung Electronics America, Inc. ("SEA").

2.     I have read the Verified Complaint. No single individual has personal knowledge of each and every fact contained therein. I have, however, reviewed the allegations therein. The allegations in the Verified Complaint are, based on my information and belief as informed by company documents and records and my own personal knowledge, true to the best of my knowledge, information, and belief.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: August 28, 2025

Yongho Park

*a*k*y*n*h*