IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SAMSUNG ELECTRONICS AMERICA, INC.<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LILLIAN CELONA; ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names and unidentified individuals),<br><br>　　　　Defendants. | Civil Action No. |

---

**PLAINTIFF SAMSUNG ELECTRONICS AMERICA, INC'S MEMORANDUM OF LAW IN SUPPORT OF ITS REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANT LILLIAN CELONA**

---

Daniel R. Levy, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 973-642-1900 (phone)
(973) 973-639-8931 (fax)

*Counsel for Samsung Electronics America, Inc.*

Of Counsel and On The Brief:
　　Daniel R. Levy

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

RELEVANT FACTS .............................................................................7

LEGAL STANDARD.............................................................................8

ARGUMENT ......................................................................................10

I.      SEA IS LIKELY TO SUCCEED ON ITS CLAIMS ...................................10

        A.      SEA Has A Likelihood of Success On its Breach
                of Contract Claim Because Celona Is Employed
                With a Competitor In A Substantially Similar Position And
                Has Already Violated Her Non-Solicitation Obligations ..................11

        B.      SEA Is Likely To Prevail On Its Trade Secret
                Misappropriation Claims And Breach Of The
                Confidentiality Provisions In The Agreement
                Because Celona Took SEA's Confidential
                Information And Has Refused to Return It
                Post-Employment .................................................................17

        C.      SEA Is Likely To Succeed On Its Breach of
                Duty of Loyalty Claim Because Celona Acted
                Contrary To SEA's Interests While Employed at SEA ....................26

II.     SEA WILL SUFFER IRREPARABLE HARM FOR
        WHICH THERE IS NO ADEQUATE REMEDY AT
        LAW IF DEFENDANT IS NOT IMMEDIATELY ENJOINED .................29

III.    AN INJUNCTION WILL NOT HARM CELONA,
        AND THE PUBLIC INTEREST SUPPORTS
        INJUNCTIVE RELIEF TO PROTECT SEA'S LEGITIMATE BUSINESS
        INTERESTS AND PROMOTE FAIR COMPETITION ...............................34

IV.     SEA IS ENTITLED TO EXPEDITED DISCOVERY ...................................36

CONCLUSION ....................................................................................37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADP, LLC v. Kusins*,
  460 N.J. Super. 368 (App. Div. 2019) ................................................................12

*ADP, LLC v. Rafferty*,
  923 F.3d 113 (3d Cir. 2019) ........................................................................11, 16

*Advanced Instructional Systems, Inc. v. Compententum USA, Ltd.*,
  2015 WL 7575925 (M.D.N.C. 2015) ..................................................................31

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*,
  157 F. Supp. 3d 407 (D.N.J. 2016) ....................................................................24

*Clemens v. ExecuPharm Inc.*,
  48 F. 4th 146 (3d Cir. 2022) ..............................................................................31

*Community Hosp. Grp., Inc. v. More*,
  183 N.J. 36 (2005) ................................................................................11, 16, 34

*FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*,
  730 F. 2d 61 (2d Cir. 1984) ...............................................................................31

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
  847 F.2d 100 (3d. Cir. 1988) .............................................................................29

*Fres-co Sys. USA, Inc. v. Hawkins*,
  2017 WL 2376568 (3d Cir. Jun. 1, 2017)....................................................21, 24

*Graco, Inc. v. PMC Global, Inc.*,
  2009 WL 904010 (D.N.J. Mar. 31, 2009) ............................................26, 27, 28

*HR Staffing Consultants, LLC v. Butts*,
  627 F. App'x 168 (3d Cir. 2015) ........................................................................15

*Ingersoll-Rand Co. v. Ciavatta*,
  110 N.J. 609 (1988) ...........................................................................................11

*Interior Motives, Inc. v. Salvatore*,
    2020 WL 2611517 (D.N.J. May 22, 2020).........................................................29

*Jackson Hewitt, Inc. v. Barnes*,
    2011 WL 181431 (D.N.J. Jan. 18, 2011)..................................................9, 31, 32

*Jackson Hewitt Inc. v. Cline*,
    2015 WL 6687545 (D.N.J. Oct. 29, 2015) ...................................................30, 31

*Kaye v. Rosefielde*,
    223 N.J. 218 (2015) ...................................................................................27

*Laidlaw, Inc. v. Student Transp. of Am., Inc.*,
    20 F. Supp. 2d 727 (D.N.J. 1998).........................................................14, 15, 31

*Lamorte Burns & Co. v. Walters*,
    167 N.J. 285 (2001) ..............................................................................26, 27, 28

*Lentjes Bischoff GmbH v. Joy Environmental Technologies, Inc.*,
    986 F. Supp. 183 (S.D.N.Y. 1997) .....................................................................36

*Manhattan Assocs., Inc. v. Ruderman*,
    2005 WL 2290297 (D.N.J. Sept. 20, 2005)...................................................34, 35

*Nat'l Reprographics, Inc. v. Strom*,
    621 F. Supp. 2d 204 (D.N.J. 2009).............................................................11, 30

*Oakwood Laboratories LLC v. Thanoo*,
    999 F. 3d 892 (3d Cir. 2021) .............................................................................31

*Platinum Mgmt., Inc. v. Dahms*,
    285 N.J. Super. 274 (Law Div. 1995)...............................................................27

*Scherer Design Group, LLC v. Schwartz*,
    2018 WL 3613421 (D.N.J. Jul. 26, 2018) .......................................26, 27, 28, 29

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001) ................................................................................9

*Singer Management Consultants, Inc. v. Milgram*,
    650 F. 3d 223 (3d Cir. 2011) ..............................................................................9

*Solari Indus., Inc. v. Malady,*
  55 N.J. 571 (1970) ........................................................................11

*Strohl Sys. Grp., Inc. v. Fallon,*
  2006 WL 2828997 (E.D. Pa. Sept. 29, 2006), *aff'd,* 372 F. App'x
  230 (3d Cir. 2010)..................................................................18, 19

*Strohl Sys. Grp. Inc. v. Fallon,*
  372 F. App'x 230 (3d Cir. 2010) ........................................17, 18, 19

*Subcarrier Commc'ns, Inc. v. Day,*
  299 N.J. Super. 634 (App. Div. 1997) ...............................................12

*Trico Equip. Inc. v. Manor,*
  2009 WL 1687391 (D.N.J. 2009) ......................................................30

*U.S. Food Serv., Inc. v. Raad,*
  2006 WL 1029653 (Ch. Div. Apr. 12, 2006) ....................................30

**Statutes**

18 U.S.C. § 1836(b)(3)........................................................................23

18 U.S.C. § 1836(b)(3)(A) ..................................................................10

18 U.S.C. § 1839(3) .....................................................................21, 22

18 U.S.C. § 1839(5) ............................................................................22

Defend Trade Secrets Act ............................................................*passim*

N.J.S.A. § 56:15-2........................................................................24, 25

N.J.S.A. § 56:15-3................................................................................26

New Jersey Trade Secrets Act .....................................................*passim*

**Other Authorities**

Federal Rules of Civil Procedure Rule 65 .........................................1, 8

Rule 26(d)(1)......................................................................................36

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Samsung Electronics America, Inc. ("SEA" or the "Company") respectfully seeks a temporary restraining order and preliminary injunction against Defendant Lillian Celona (f/k/a Lillian Giannoglou) ("Celona" or "Defendant"): (1) enjoining Celona, from working for a competitor, including her current employer, Midea America Corp. ("Midea"), in any role the same or substantially similar to her SEA role or that would require use or disclosure of SEA Confidential Information; (2) enjoining Celona from soliciting SEA customers with whom she had contact while at SEA and from soliciting SEA employees; (3) ordering the immediate return of SEA's Trade Secret and other Confidential Information[1] (as those terms are defined at Paragraphs 66-67 of the Verified Complaint); (4) ordering a neutral, Court-approved forensic inspection of Celona's personal devices and accounts (including her Gmail account to which SEA Confidential Information and Trade Secrets were transferred); (5) enjoining Celona from using or disclosing any SEA Trade Secrets or Confidential Information; and (6) requiring sworn identification of any SEA customers contacted on behalf of Midea.

---

[1] "Trade Secrets" and "Confidential Information" used throughout refer to the definitions outlined in the Agreement.

SEA seeks this narrow, status-quo-preserving relief to prevent the irreparable injury posed by Celona's pre-departure exfiltration of SEA files and her post-departure work for a direct competitor in violation of her Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement"). In considering SEA's tailored and reasonable request for equitable relief, SEA asks the Court to take into account Celona's blatant dishonesty at the time of her departure, her utter failure to respond to SEA's multiple outreaches, and her intentional taking and continued retention of SEA Confidential Information and Trade Secrets.

On February 26, 2024, Celona executed an Agreement, in connection with a job promotion, that prohibits her from working for a competitor in the same or similar role to the one she held at SEA or that would require her to use SEA's Confidential Information, during her employment with SEA and for six months following a separation for any reason. Celona also agreed not to solicit SEA's customers or employees for the same narrowly tailored restrictive period of six months. The Agreement contains confidentiality provisions under which Celona agreed not to use for the benefit of or disclose to any third party, any SEA Trade Secrets or Confidential Information during and after employment and requires the immediate return of SEA materials upon her separation from SEA. The terms of the Agreement acknowledge the inevitability of irreparable harm for a breach of these narrowly tailored obligations and authorizes injunctive relief.  Notably here, Celona

has not only breached multiple contractual obligations, but has also violated both state and federal law in her unlawful taking of SEA's Trade Secret and Confidential Information, further substantiating the need for emergent injunctive relief to make SEA whole.

While employed at SEA, Celona, who was most recently employed by SEA as a Senior Professional I, Product Management, with the title of Senior Manager, had access to SEA's highly confidential and proprietary sales data, pricing information and strategies, and business strategies. Celona also had access to SEA Trade Secrets and proprietary Confidential Information related to SEA's Home Appliance Division[2] including strategic plans, pricing structures, profit and loss information, customer lists, margin targets, and customer data. The confidential and proprietary information that Celona had access to would be incredibly valuable to SEA's competitors, particularly Midea.

Celona's decision to accept employment with Midea in a competitive role is a clear violation of the noncompete provision in the Agreement, in which she agreed to refrain from providing services for an SEA Competitor[3] for a period of six-months after resigning from SEA. Of particular concern to SEA is the fact that when Celona resigned, SEA specifically asked her about her plans for new employment, and

---

[2] The Home Appliances Division is now internally referred to as "Digital Appliances" or "DA" within the SEA organization.

[3] Competitor" refers to the definition of this term in the Agreement.

Celona misrepresented to SEA that she had not accepted any employment, let alone employment with a direct competitor of SEA.

Due to her misdirection, SEA only recently learned that Celona, had, in fact, accepted an employment offer with Midea and is currently employed by Midea. Even more concerning to SEA is that, at about the same time she would have been in discussions with Midea about employment, Celona transferred highly confidential SEA information to her personal Gmail account in violation of the confidentiality provisions in the Agreement. Specifically, upon learning that Celona may have commenced employment with Midea, SEA promptly opened an investigation into Celona's computer activity in the weeks leading up to her resignation, and discovered that, prior to tendering her resignation, Celona forwarded to her personal e-mail account a file containing a comprehensive roadmap of her job duties at SEA that revealed a treasure trove of SEA Trade Secrets and Confidential Information, including but not limited to, information regarding SEA's products, sales data, pricing information, and business strategies (hereinafter the "Roadmap File"). Thus, Celona is currently in possession of SEA's Confidential Information and Trade Secrets, which she is poised to use and/or disclose if she is permitted to continue her employment with Midea.

Despite SEA's repeated efforts to secure the return of its Trade Secrets and other Confidential Information that Celona took from SEA shortly before her

resignation from the Company, Celona has refused to cooperate with SEA's repeated and reasonable requests or otherwise return the files and/or property to SEA. Indeed, Celona has completely ignored multiple letters from both in-house and outside counsel for SEA.  SEA has recently learned that, beyond just working for Midea in a competitive role and exfiltrating highly confidential SEA information, Celona has solicited at least one SEA customer to reduce its business with SEA in violation of the customer non-solicitation provision in the Agreement. The totality of Celona's blatant disregard for her ongoing post-separation obligations to SEA and misappropriation of SEA's Trade Secret and Confidential Information, as well as her continued actions on behalf of SEA's direct competitor, demonstrates the clear need for emergent injunctive relief to protect SEA's legitimate business interests.

To be sure, in bringing this action, SEA does <u>not</u> seek to stop Celona from earning a living or pursuing subsequent employment following her separation from SEA. SEA only seeks to ensure Celona's compliance with the narrowly tailored contractual obligations that she accepted as a condition of her promotion and heightened responsibilities at SEA, obligations which are imperative to protecting SEA's business interests, as well as its Trade Secret and Confidential Information. SEA's requests are limited and tailored to the circumstances: that Celona be ordered to immediately stop working in a position with responsibilities for home appliances for the next six months in violation of her noncompete; stop soliciting SEA

summary

customers in violation of the Agreement; and that she return any SEA Confidential Information and Trade Secrets in her possession, custody, or control, submit her storage devices and e-mail/cloud accounts to a forensic inspection by a neutral third-party forensics company, and identify any person or entity with whom Celona shared any SEA Confidential Information or Trade Secrets.

Celona's violation of the restrictive covenants in her Agreement and her misappropriation of SEA Trade Secrets and Confidential Information will cause SEA to suffer irreparable harm that cannot be remedied by money damages alone. Accordingly, SEA commenced this action to recover all losses caused by Celona's unlawful conduct, including equitable relief to prevent Celona from continuing to violate her restrictive covenant by continuing employment with a direct competitor of SEA and utilizing SEA's Confidential Information and Trade Secrets, causing SEA to suffer further irreparable harm. Thus, in addition to the ultimate relief sought, SEA seeks immediate temporary and preliminary relief.

SEA satisfies the "likelihood of success" prong for injunctive relief in connection with its claims for breach of the non-competition and non-solicitation covenants of the Agreement, breach of the confidentiality covenant of the Agreement, misappropriation of trade secrets under the Defend Trade Secrets Act (the "DTSA") and New Jersey Trade Secrets Act ("NJTSA"), and breach of the duty of loyalty. SEA also meets the remaining three elements required to grant the

injunctive relief sought here: (1) irreparable harm flows from the loss of control over trade secrets; (2) risk of disclosure/use of SEA's Trade Secrets and Confidential Information by a competitor is imminent; and (3) the erosion of customer goodwill is inevitable. These injuries are not compensable by money damages alone.

The balance of equities favors SEA: the requested restraints merely require Celona to abide by bargained-for covenants and Celona brought any harm upon herself by voluntarily resigning and accepting employment with a Competitor in violation of the Agreement and misappropriating SEA's trade secrets and confidential information. The public interest likewise supports protecting trade secrets and enforcing reasonable restrictive covenants that safeguard fair competition. Accordingly, SEA respectfully requests that the Court grant its motion for a Temporary Restraining Order ("TRO") and preliminary injunction in its entirety.

## RELEVANT FACTS

SEA relies upon the facts set forth in the Verified Complaint ("Verif. Compl."), as well as the Declarations of Yongho Park and Jim Hogg, incorporated herein, which establish Celona's clear and undisputable obligations to SEA, under contract and by law, as well as Celona's breaches of such ongoing obligations. SEA's multiple pre-litigation attempts to resolve this matter without instituting litigation are addressed at Paragraphs 6, 88-90, and 95-96 of the Verif. Compl.,

including Celona's failure to respond to any of SEA's communications and Midea's failure to provide any substantive response to SEA's repeated requests for information relating to Celona's roles and responsibilities at Midea.[4]

## LEGAL STANDARD

SEA seeks a temporary restraining order ("TRO") and preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure: (1) ordering the immediate return of SEA's Trade Secrets and other Confidential Information; (2) directing a neutral, Court-approved third-party forensic expert to inspect Celona's personal devices and accounts—including the Gmail account that received SEA files pre-departure—to identify, isolate, and remove SEA data and certify remediation; (3) enjoining, now on a temporary basis and later preliminarily and permanently, Celona from using or disclosing any of SEA's Trade Secrets or other Confidential Information; (4) enforcing the six-month contractual restriction by enjoining Celona from working for any competitor—including Midea—in any role the same as or substantially similar to her SEA role or that would foreseeably require use or disclosure of SEA Confidential Information; (5) enjoining Celona from soliciting SEA customers with whom she had contact while at SEA and from soliciting SEA

---

[4] On August 27, 2025, outside counsel for Midea contacted the undersigned to inform SEA that Celona has been "placed on leave." (Verif. Compl., at ¶ 100). At this time, SEA remains without knowledge as to the scope and intended time-period of Celona's leave and without information repeatedly requested concerning the nature of Celona's role and activities at Midea.

employees or contractors; and (6) requiring Celona, under oath, to identify her start date and responsibilities with Midea (if any), the devices and accounts she uses, and any SEA customers she has contacted since her departure, so the Court can fashion effective, narrowly tailored relief and ensure compliance.

The standards governing a TRO and a preliminary injunction are the same. *Singer Management Consultants, Inc. v. Milgram*, 650 F. 3d 223, 236 n.4 (3d Cir. 2011) (*citing Miller v. Mitchell*, 598 F. 3d 139, 145 (3d Cir. 2010) (other citation omitted)). The movant must demonstrate that: (a) it has shown a reasonable probability of success on the merits; (b) it will be irreparably injured by denial of the relief; (c) the granting of the relief will result in relatively greater protection for the moving party than harm for the non-moving party; and (d) the granting of the preliminary relief will be in the public interest. *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001); *Jackson Hewitt, Inc. v. Barnes*, 2011 WL 181431, at *2 (D.N.J. Jan. 18, 2011). SEA demonstrates all four elements and, therefore, the Court should grant its motion for a TRO and preliminary injunction against Celona.

As demonstrated in further detail below, SEA amply satisfies the foregoing standard. Notably, SEA has a strong likelihood of success on the merits of its claims, and, absent an immediate TRO, it will suffer immediate irreparable harm if Celona continues to unfairly compete and solicit SEA's customers in violation of the Agreement, and if she continues to possess SEA's Confidential Information and

Trade Secrets and uses it to her benefit. Further, the relative balance of hardships and public interest undoubtedly tip in favor of granting SEA's application for injunctive relief. New Jersey courts routinely grant injunctions barring employees from violating restrictive covenants and from using confidential and trade secret information belonging to a former employer.  All four elements are satisfied here, and therefore, the Court should grant its motion for a TRO and preliminary injunction against Celona. Finally, SEA is entitled to injunctive relief for the independent reason that, as proscribed by the DTSA, there exists a threatened use of SEA's Trade Secrets. *See* 18 U.S.C. § 1836(b)(3)(A) (the DTSA allows a court to grant an injunction "to prevent any actual or threatened misappropriation").

## ARGUMENT

## POINT I

## SEA IS LIKELY TO SUCCEED ON ITS CLAIMS

The record to date demonstrates that SEA is likely to prevail on the merits of its claims. First, Celona breached her contractual obligations—including her non-compete and non-solicit covenants—by accepting employment with Midea in a position that is substantially similar to the position she held at SEA. Second, SEA is likely to prevail on its claims under DTSA and NJTSA, as well as for breach of the confidentiality provisions of her agreement, because of Celona's clearly documented transfer of the Roadmap File to her personal Gmail account prior her resignation, followed by a refusal to comply with SEA's reasonable demands to return the

Confidential Information known to be in her possession. In addition to constituting breach of contract and misappropriation of trade secrets under the DTSA and the NJTSA, Celona's conduct constitutes breach of the duty of loyalty.

Accordingly, SEA is likely to succeed on its claims for breach of contract, misappropriation under the DTSA and NJTSA, and breach of the duty of loyalty.

**A. SEA Has A Likelihood of Success On Its Breach of Contract Claim Because Celona Is Employed With a Competitor In A Substantially Similar Position And Has Already Violated Her Non-Solicitation Obligations.**

New Jersey Law establishes four elements in a breach of contract claim: (1) the existence of a contract; (2) breach of that contract; (3) plaintiff suffered damages as a result of the breach, and (4) plaintiff performed its duties. *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 222 (D.N.J. 2009) (citing *Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 385 n.21 (D.N.J. 2006)). Further, New Jersey enforces reasonable restrictive covenants that protect a company's legitimate interests so long as the restraints are no broader than necessary and do not unduly harm the employee or the public. *See Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576–78 (1970); *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 635–39 (1988); *Community Hosp. Grp., Inc. v. More*, 183 N.J. 36, 58–60 (2005); *ADP, LLC v. Rafferty*, 923 F.3d 113, 120–24 (3d Cir. 2019) (applying New Jersey law). SEA's covenants readily satisfy this standard, and the record establishes multiple breaches. (*See* Verif. Compl., at ¶¶ 87, 127, 132, 151, 170).

**1.    The Non-Competition And Non-Solicitation Covenants Are Valid, Reasonable Covenants Protecting SEA's Legitimate Interests.**

As consideration for her promotion to Senior Professional I, Product Management (effective March 1, 2024) at SEA, Celona executed the Agreement on February 26, 2024. (Verif. Compl. ¶¶ 26, 65). The Agreement sets forth a six-month non-competition restriction against working for a Competitor (as defined in the Agreement) in the same or a substantially similar role, or in any role requiring use or disclosure of SEA Confidential Information. (*See* Verif. Comp. at ¶¶ 68-69; Ex. 1 at ¶12). It also prohibits (again, only for six months) the solicitation of SEA customers with whom Celona had contact in her last year of employment at SEA. *See* Verif. Comp. at ¶¶ 75-76; Ex. 1 at ¶13).

Celona acknowledged that the restrictive covenants are necessary to protect SEA's goodwill and Confidential Information. These narrowly tailored, six-month restrictions, tied to similar roles and use of Confidential Information, protect SEA's legitimate business interests in customer goodwill and non-public commercial strategy and are enforceable under New Jersey law. *See ADP, LLC v. Kusins*, 460 N.J. Super. 368, 396–405 (App. Div. 2019) (finding a non-compete provision reasonable where it restricted the former employees, for a reasonable time, from providing services to a competing business); *Subcarrier Commc'ns, Inc. v. Day*, 299 N.J. Super. 634, 642–45 (App. Div. 1997).

### 2. SEA Has Established Clear Breaches Of Both The Non-Competition And Customer Non-Solicitation Covenants.

The record establishes that, within mere weeks of her separation from SEA, Celona commenced employment with Midea as its Senior Manager, Regional Sales. (Verif. Compl., at ¶ 94). Midea is indisputably a direct competitor in the home appliances market—selling and marketing refrigerators and laundry machines and related appliances, including a washer-dryer combination model. (*Id.* at ¶¶ 18, 73). Under the Agreement's definition, a Competitor includes any entity selling products in the business/markets of any Division of the Company in which the employee worked. (*Id*. at ¶ 69). Celona served in SEA's Home Appliance Division from April 2021 through July 2025, with responsibility for home-appliance product marketing and comprehensive sales strategies in support of customer relationships with national and regional retail channels. (*See id.* at ¶ 20).

As SEA's Senior Professional I, Celona's responsibilities included product marketing for Refrigeration and Laundry, with customer-facing responsibilities to discuss product launches and other product information with national and regional retailers throughout the United States. In her final months of employment with SEA, Celona was primarily responsible for product management functions supporting the Laundry business and had direct responsibility for SEA's Flagship Combo Product. (*Id*. at ¶ 21). Celona's role and job duties were designed to drive the overall sales of SEA's Home Appliance products.

Within twelve days of resigning, Celona began working at Midea as its Senior Manager, Regional Sales, a role Midea has described as serving an existing account's needs end-to-end—i.e., precisely the same customer-facing, go-to-market functions in the same product space. (*Id.* at ¶ 94). On July 22, 2025, SEA employees attending the annual North American Trade Merchant ("NATM") Vendor Conference in Texas witnessed Celona in attendance at the same industry event, seemingly representing Midea and approaching SEA customers. (*Id.* at ¶¶ 35, 79). These facts place Celona in a role that is with a direct Competitor and, at a minimum, is the "same or substantially similar" to her SEA position—or one that foreseeably requires use of SEA's confidential commercial information— thereby directly violating her non-compete obligation. (*Id.* at ¶¶ 2, 127).

The Agreement also prohibits Celona, for six months post-departure, from soliciting any SEA customer/account with whom she had contact or about whom she had access to confidential information in her last year. (*Id.* at ¶¶ 75-76). By August 6, 2025, SEA learned that Celona had contacted at least one regional-retail SEA customer ("Customer 1")—an account within her SEA portfolio—on Midea's behalf. (*Id.* at ¶¶ 80-82). That conduct is a textbook breach of the customer non-solicitation covenant, and courts routinely enjoin precisely this behavior to prevent unfair head-starts and to protect ongoing customer relationships. *See Laidlaw, Inc.*

*v. Student Transp. of Am., Inc*., 20 F. Supp. 2d 727, 755–59 (D.N.J. 1998); *HR Staffing Consultants, LLC v. Butts*, 627 F. App'x 168, 173–75 (3d Cir. 2015).

Celona's breach of the Agreement is reinforced by her possession of SEA's Roadmap File. Indeed, weeks before resigning—and while likely in discussions with Midea—Celona secretly transferred to her personal Gmail SEA's Roadmap File containing SEA's confidential pricing structures, sales data with national retailers, product roadmaps, marketing plans, strategy, and competitive analysis in light of ongoing tariff challenges, including sales information for the Flagship Combo Product released shortly before her departure. (Verif. Compl. ¶¶ 37-42; Hogg Decl., Ex. A). The nature of that file directly matches the duties Midea hired her to perform (regional sales/customer-facing execution in the same appliance verticals), undeniably confirming that her new position is substantially similar and that her competitive work would require—or at least invite—use of SEA Confidential Information, exactly what the Agreement forbids.

The Verified Complaint pleads these breaches expressly. (*See id.* at ¶¶ 124-133; 163-174). Courts routinely enforce such customer-facing non-compete and non-solicitation provisions to prevent unfair competition and protect ongoing customer relationships. *See Laidlaw, Inc.*, 20 F. Supp. 2d at 755–59; *HR Staffing Consultants*, 627 Fed. App'x at 173–75.

### 3. The Facts Surrounding Celona's Departure And Current Employment With Midea Underscore Why The Non-Competition And Non-Solicitation Restrictions Must Be Enforced Now.

Celona misrepresented her post-SEA plans when she resigned on June 25, 2025, stating she had not accepted new employment and planned to "chill out," even as she was preparing to join Midea and had already exfiltrated the Roadmap File to her personal Gmail on May 21, 2025. (Verif. Compl. ¶¶ 33-44). After SEA placed both Celona and Midea on notice of Celona's apparent breaches of the Agreement: (i) neither provided the requested information; (ii) by August 6, 2025, SEA learned of Celona's solicitation of Customer #1; and (iii) by August 11, Midea confirmed Celona's July 21 start date. (*Id*. at ¶¶ 94-100). Celona has ignored SEA's multiple, reasonable demands to return SEA information and to account for her competitive activities. (*Id*. at ¶¶ 101-109). These facts—immediate competitive employment in the same product space, customer-facing outreach to SEA accounts, and possession of SEA's pricing/roadmap data—are precisely the scenario in which New Jersey courts enforce reasonable non-compete and non-solicitation covenants to protect confidential go-to-market plans and customer goodwill. *See Rafferty*, 923 F.3d at 121–24; *More*, 183 N.J. at 58–60.

SEA is likely to prevail on its breach-of-contract claims enforcing the six-month non-competition and non-solicitation covenants. The covenants are reasonable; they protect recognized interests (customer goodwill and confidential

commercial information); and the undisputed facts show that Celona joined a direct competitor in a substantially similar, customer-facing role that will require the use or disclosure of SEA Confidential Information. Moreover, Celona has contacted SEA customers in direct violation of the customer non-solicitation covenant contained within the Agreement.

**B.**   **SEA Is Likely To Prevail On Its Trade Secret Misappropriation Claims And Breach Of The Confidentiality Provisions In The Agreement Because Celona Took SEA's Confidential Information And Has Refused To Return It Post-Employment.**

SEA is likely to prevail on its claims related to Celona's theft and misappropriation of trade secrets, including SEA's claims for: (i) breach of the confidentiality provisions contained in the Agreement; (ii) violation of the DTSA; and (iii) violation of the NJTSA.

**1.**   **SEA is Likely to Prevail on its Claim for Breach of The Confidentiality Provisions Contained Within The Agreement.**

The underlying principle of SEA's breach of contract claim is based on the simple notion that Celona took information that belonged to SEA and has continually refused to comply with SEA's reasonable demands that she return the information.

The United States Court of Appeals for the Third Circuit has held that a former employee breaches an employment agreement by taking the employer's confidential information. *See Strohl Sys. Grp. Inc. v. Fallon*, 372 F. App'x 230, 231-32 (3d Cir. 2010). The trial court stated, and the Third Circuit affirmed, that defendant's taking

and disclosure of the confidential information "is exactly the type of situation the provisions [of the contract] were intended to avoid." *Strohl Sys. Grp., Inc. v. Fallon*, 2006 WL 2828997, at *3 (E.D. Pa. Sept. 29, 2006), *aff'd*, 372 F. App'x 230 (3d Cir. 2010) ("Confidentiality provisions are designed to protect the interests of a company and address its need to keep sensitive information from falling into the hands of competitors or others, known or unknown, who might have adverse interests.").

As in *Strohl*, Celona is subject to a valid Agreement that required her not to take SEA's Confidential Information and also required her to return any SEA Confidential Information at the conclusion of her employment. (Verif. Compl, Ex. 1, at ¶¶ 4-5). Celona breached the Agreement by taking SEA's Confidential Information. She also breached the Agreement by her continued refusal to cooperate with SEA to return the Confidential Information and Trade Secrets to SEA.

As a condition of her employment with SEA, Celona agreed to confidentiality obligations. (*Id.* at ¶ 5). Celona agreed that she would not "take any" records or data that relate to the business activities of the Company. (*Id.*) She also agreed that if she stored any such information or data on any "personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo)," she "**must tender those devices to the Company to have the data removed and/or have complete copies of the medium and all information stored**." (*Id.*) (emphasis added). Celona also agreed that "immediately upon termination[,] . . . or at any other time the Company

so requests, [to return] to the Company . . . all [SEA documents] and equipment . . . including but not limited to all Confidential Information, which are in the possession of or under the control of Employee. (*Id*.).

Here, not only did Celona breach her contractual obligations to SEA when she transferred SEA's Confidential Information to her personal Gmail account, she also blatantly ignored ***all*** of SEA's good faith attempts to retrieve SEA's Confidential Information and Trade Secrets. SEA requires its employees to agree to confidentiality and non-disclosure agreements, such as Defendant's Confidentiality Agreement, to prevent an employee taking information with the intention of using it for their own benefit. *See Strohl Sys. Grp., Inc*., 372 Fed. App'x at 231-32.

Moreover, based on Celona's failure to cooperate with SEA's repeated demands that she return SEA's Confidential Information and Trade Secrets, it is reasonable to conclude that Celona has disclosed, and will continue to disclose, SEA's Confidential Information and Trade Secrets in breach of her contractual obligations. On August 1, 2025, and again on August 16, 2025, SEA sent letters to Celona with reminders of her contractual obligations and demanding that she, among other things, immediately return to SEA all SEA property in her possession, custody or control and confirm in writing her employment status, including identification of her current employer, job title, and nature of her job duties. (*See* Verif. Compl., Exs.

2; 3).[5] SEA demanded that Celona respond to its letters no later than August 6, 2025 and August 19, 2025 respectively. (*See id*.). To date, Celona has not responded to SEA's communications to her. (*Id*. at ¶¶ 101-109).

Celona breached the Agreement by taking the Roadmap File containing SEA's Confidential Information and Trade Secrets. She also breached the Agreement by, despite SEA's multiple requests that she cooperate, failing to return the information to SEA. Simply put, SEA can establish a likelihood of success on a breach of contract claim due to Celona's theft of the SEA information, contractual duties to SEA, and her refusal to return the information.

### 2. SEA is Likely to Prevail Under the DTSA Because Celona Misappropriated and Retains SEA Trade Secrets.

SEA is likely to succeed on its claim for misappropriation of trade secrets pursuant to the DTSA because Celona transferred SEA Trade Secret and Confidential Information to her personal Gmail account. As evidence of her intent to harm SEA, Celona deliberately ignored SEA's numerous attempts to retrieve this information. The foregoing facts are indicative of Celona's intent to use and/or

---

[5] Also on August 1, 2025, the Senior Manager of SEA's Security and Investigations Team sent an e-mail to Celona requesting that she provide a "complete inventory" of all SEA "documents, digital and otherwise, that you currently have in your possession." (Verif. Compl., at Ex. 4). That email provided Celona with detailed instructions on how to provide SEA with the complete inventory; however, she chose not to respond. (Verif. Compl., at ¶¶ 102-103).

disclose this Confidential Information and Trade Secrets. As such, there is an ongoing and imminent threat that she will use or disclose such information.

Under the DTSA, "misappropriation of trade secrets need not have already occurred to warrant injunctive relief; threatened misappropriation is sufficient" basis for a preliminary injunction. *Fres-co Sys. USA, Inc. v. Hawkins*, 2017 WL 2376568, at *3 (3d Cir. Jun. 1, 2017) (citing 18 U.S.C. § 1836(b)(3)(A)(i) (a court may grant an injunction "to prevent any actual or threatened misappropriation")). As this Court can enjoin actual or threatened misappropriation of trade secrets, SEA need not wait until the actual use or disclosure of a trade secret to move for injunctive relief.

A "trade secret" is broadly defined by the DTSA as follows:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A)  the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B)  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

Here, Celona transferred SEA's Roadmap File containing SEA's Trade Secrets and Confidential Information regarding SEA's products, sales data, pricing information, and business strategies. (Verif. Compl., at ¶ 37). The Roadmap File contains protectable trade secrets under the DTSA, including highly confidential information relating to SEA's Home Appliance Division, including but not limited to SEA's: (a) profit information and pricing structure; (b) Laundry Flooring File that contains SEA's sales information with national retailers; (c) highly confidential pricing information across SEA's laundry products; and (d) competitive information in light of the current tariff challenges facing all companies in this space. *See* 18 U.S.C. § 1839(3).

The DTSA defines "misappropriation" as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret []derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

18 U.S.C. § 1839(5).

Celona undeniably obtained SEA's Trade Secrets and Confidential Information as a result of her employment with SEA. Moreover, SEA has grave

concerns about Celona's ongoing access to, and retention of, its information, given the fact that Celona lied about joining Midea, has continually refused to cooperate with SEA regarding the return of the stolen files, and is currently employed in a similar role with a direct competitor. As described in Paragraphs 45-64 and 118-120 of the Complaint, SEA's Trade secrets and Confidential Information is kept confidential and has been developed over a long period at great expense to SEA.[6]

The DTSA provides that the Court may grant an injunction "to prevent any actual or threatened misappropriation … on such terms as the court deems reasonable," as long as the order does not prevent the person from entering into an employment relationship, and conditions placed on any such employment are to be based on evidence of threatened misappropriation. 18 U.S.C. § 1836(b)(3). Despite the steps SEA has taken to keep its information confidential, if a TRO is not issued,

---

[6] SEA instituted effective measures to safeguard its Confidential Information and Trade Secrets, including having in place policies, procedures, and systems that protect its Confidential Information and Trade Secrets from disclosure to others and from use by anyone for purposes other than in SEA's interests. These steps include that its computer network is protected by multiple layers of required authentication to access shared drives and documents, use of SVPN and multi-factor authentication, requiring that all employees sign a Security Pledge, maintaining policies and procedures that data and information on the SEA computer network are proprietary and confidential, use of a Data Loss Prevention application to prevent unauthorized transfer of information, and requiring that employees regularly complete web-based security and confidentiality training to remind employees of their obligation not to use or disclose to any third party any SEA Confidential Information or Trade Secrets. (*See* Verif. Compl., at ¶¶ 45-64).

the secrecy of SEA's information will be immediately jeopardized, thereby placing SEA at a significant, unfair competitive disadvantage.

Accordingly, in light of this immediate threat, SEA has demonstrated a likelihood of success on its claim for misappropriation of trade secrets under the DTSA. *See Fres-co Sys. USA, Inc.*, 2017 WL 2376568, at *3.

### 3. SEA is Likely to Succeed on its NJTSA Claim for the Same Reasons it Succeeds Under the DTSA (Actual and Threatened Misappropriation).

Similarly, SEA is also likely to succeed on its claim for misappropriation of trade secrets pursuant to the NJTSA. A trade secret is defined by NJTSA as "information" that:

> (1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (2) that the holder reasonably endeavors to maintain confidential.

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 423 (D.N.J. 2016); N.J.S.A. § 56:15-2. The NJTSA defines "misappropriation" similar to that of DTSA's definition. *See* N.J.S.A. § 56:15-2.

It is without question that the Roadmap File contains SEA's Trade Secrets and Confidential Information, as Celona transferred information regarding SEA's products, sales data, pricing information, and business strategies. Much of the information contained within this file was communicated in confidence to Celona

pursuant to her employment with SEA, she expressly agreed to keep the information confidential and return any such information at the conclusion of her employment. (*See* Verif. Compl., at Ex. 1). By taking SEA's Trade Secrets and Confidential Information and refusing to return them, Celona has misappropriated SEA Trade Secrets in violation of the NJTSA.

Celona transferred SEA's Roadmap File to her personal Gmail account. (*See* Verif. Compl. at ¶ 37; Hogg Decl., Ex. A). She was aware that the file contained SEA Confidential Information and Trade Secrets, yet she nevertheless transferred the file in direct violation of her legal obligations to SEA. Celona then ignored SEA's good faith attempts to retrieve this information from her. Celona's lack of cooperation (or even response) evinces her knowledge of the fact that she took SEA's Trade Secrets and Confidential Information through improper means (in accordance with N.J.S.A. § 56:15-2) and further evinces her intent to use and/or disclose these confidential trade secrets.

Despite the numerous steps SEA has taken to keep its Trade Secrets and Confidential Information secure and protected, SEA's Confidential Information has been jeopardized by Celona's theft of such information. Further, if a TRO is not issued, the secrecy of SEA's information will be further jeopardized, thereby placing SEA at a significant, unfair competitive disadvantage. Accordingly, considering this immediate threat, SEA has demonstrated a likelihood of success on its claim for

misappropriation of trade secrets under the NJTSA. The NJTSA provides that "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined." N.J.S.A. § 56:15-3.

Accordingly, SEA is entitled to entry of temporary restraints against Celona for the return of its Trade Secrets and Confidential Information and for a forensic inspection to determine whether SEA's Trade Secrets and Confidential Information have been used or disclosed to any third party.

## C.    SEA Is Likely To Succeed On Its Breach of Duty of Loyalty Claim Because Celona Acted Contrary To SEA's Interests While Employed At SEA.

An employee may not act contrary to an employer's interests. *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 302 (2001) (citing *Chernow v. Reyes*, 239 N.J. Super. 201, 204 (App. Div.), *certif. den.*, 122 N.J. 184 (1990)); *see also Scherer Design Group, LLC v. Schwartz*, 2018 WL 3613421, at *5 (D.N.J. Jul. 26, 2018) (the duty of loyalty dictates that while employed, employees must refrain from acting contrary to the employer's interests).  Further, "an employee has a duty not to compete with his or her employer." *Lamorte Burns*, 167 N.J. at 302 (citing *Cameco, Inc. v. Gedicke*, 157 N.J. 504, 517-18 (1999)). Moreover, "**an employee who takes legally protected information from his employer to seek a competitive advantage upon resignation also breaches his duty of loyalty**." *Graco, Inc. v. PMC Global, Inc.*,

2009 WL 904010, at *18 (D.N.J. Mar. 31, 2009) (citing *Lamorte Burns*, 167 N.J. at 304) (emphasis added).

Thus, "'[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency.'" *Id.* (quoting Restatement (Second) of Agency, § 393 (1958)). "An employee's duty of loyalty to his or her employer goes beyond refraining from privately soliciting the employer's customers while still employed.  The duty of loyalty prohibits the employee from taking affirmative steps to injure the employer's business." *Id.* at 305. Thus, an employee breaches his duty of loyalty to his employer when he engages in "acts of secret competition." *Lamorte Burns*, 65 N.J. at 303; *see also Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 303 (Law Div. 1995) (same).

Courts review four factors to determine whether there has been a breach of the duty of loyalty: (1) the existence of contractual provisions that are relevant to the employee's actions; (2) the employer's knowledge of the employee's actions; (3) the employee's status and his relationship to the employer; and (4) the nature of the employee's conduct and the effect on the employer. *Scherer Design Group*, 2018 WL 3613421, at *5 (quoting *Kaye v. Rosefielde*, 223 N.J. 218, 230 (2015)).[7]  "More specifically, an employee must not engage in secret acts of competition while still

---

[7] The Supreme Court of New Jersey has held that where an employee breaches his duty of loyalty, he may also be compelled to forego the compensation earned during the period of disloyalty. *Kaye*, 218 N.J. at 233.

employed[.]" *Id.* (citations omitted); *see also Lamorte Burns*, 65 N.J. at 305 (stating that the employee's duty of loyalty prevents the employee, *while still employed*, from taking affirmative steps to injure the employer's business).

Celona's deceptive misconduct leading up to her resignation from SEA indicates that she was, in fact, engaged in "secret acts of competition" while still employed at SEA. In the weeks leading up to her notice of voluntary resignation to SEA, on May 21, 2025, Celona transferred SEA Confidential Information and Trade Secrets to her personal Gmail account. Celona's unauthorized transfer and retention of SEA's Trade Secrets and Confidential Information—in direct violation of the Agreement and SEA's Security Policy—and her refusal to return it despite repeated demands constitute a material breach of her contractual confidentiality obligations and a violation of her duty of loyalty. Celona's breach of duty of loyalty is compounded by the fact that, while still employed at SEA, SEA asked Celona the identity of her new employer. Celona concealed her plans to join Midea by misrepresenting to SEA that she had not accepted <u>any</u> new employment.

As such, SEA is likely to establish all elements of its claims for breach of the duty of loyalty. *See Lamorte Burns*, 167 N.J. at 302-04; *see also Scherer Design Group*, 2018 WL 3613421, at *5; *Graco, Inc.*, 2009 WL 904010, at *18. Celona has confidentiality and non-disclosure obligations pursuant to the Agreement. SEA discovered Celona's breach after she notified SEA of her intention to resign

and after an SEA employee witnessed her at an industry event seemingly working on behalf of Midea. When SEA became aware of her misappropriation, it immediately made multiple attempts to retrieve its information; however, Celona has refused to cooperate with SEA, giving SEA no choice but to take this legal action to remedy Celona's breach of loyalty. Therefore, a TRO should issue as a result of Celona's breach of loyalty owed to SEA. *See*, *e.g.*, *Interior Motives, Inc. v. Salvatore*, 2020 WL 2611517, at *1 (D.N.J. May 22, 2020) (granting TRO where defendant employee breached his duty of loyalty by stealing his employer's confidential or proprietary information); *Scherer Design Group*, 2018 WL 3613421, at *2 (granting preliminary injunction based on breach of duty of loyalty where defendants downloaded their employer's files).

## POINT II

### SEA WILL SUFFER IRREPARABLE HARM FOR WHICH THERE IS NO ADEQUATE REMEDY AT LAW IF DEFENDANT IS NOT IMMEDIATELY ENJOINED

SEA is facing imminent risk of irreparable harm to its business due to the wrongful conduct of Celona in (a) violating her Agreement, and (b) actually or imminently exploiting SEA's Confidential Information and Trade Secrets.

The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that it will experience harm that cannot be adequately compensated after the fact by monetary damages. *See Frank's GMC Truck Ctr., Inc. v. Gen.*

*Motors Corp.*, 847 F.2d 100, 102-103 (3d. Cir. 1988). It is generally accepted under New Jersey law that improper use of trade secrets constitutes irreparable harm because, where a trade secret is stolen, it is often difficult to calculate the full extent of monetary loss incurred once such secret competitive information has been compromised. *See Jackson Hewitt Inc. v. Cline*, 2015 WL 6687545, at *4 (D.N.J. Oct. 29, 2015) (stating that "[w]here a party is in possession of another party's confidential information and is poised to disclose such information, there is a likelihood of irreparable harm."); *see also U.S. Food Serv., Inc. v. Raad*, 2006 WL 1029653, *7 (Ch. Div. Apr. 12, 2006).

Courts in this district routinely find, when applying such New Jersey law, that the threatened disclosure of trade secrets and confidential information is not economic loss that can be fully compensated by a damage award and can only be prevented by injunctive relief. *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229-230 (D.N.J. 2009) (finding irreparable harm to former employer would result where defendant had access to former employer's business strategies that defendant would inevitably use for the benefit of his new employer, who was a direct competitor of plaintiff); *Trico Equip. Inc. v. Manor*, 2009 WL 1687391 (D.N.J. 2009) (finding plaintiff proved it would suffer serious irreparable injury by virtue of the disclosure of its confidential and customer information to a direct competitor by former employee who learned such information while working for plaintiff);

*Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm.").[8] This Court's similar finding would have a solid foundation.

Furthermore, as the Third Circuit has held, "a plaintiff need not wait until he or she has *actually* sustained the feared harm in order to seek judicial redress, but can file suit when the risk of harm becomes imminent." *Clemens v. ExecuPharm Inc.*, 48 F. 4th 146, 152 (3d Cir. 2022). Moreover, "intangible harms like the disclosure of private information qualify as concrete" harm. *Id.* at 159 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).

Thus, in accordance with New Jersey law, "[w]here a party is in possession of another party's confidential information and is poised to disclose such information, there is a likelihood of irreparable harm." *Jackson Hewitt Inc.*, 2015 WL 6687545, at *4. In *Jackson Hewitt*, the District of New Jersey also noted that

---

[8] *See also Oakwood Laboratories LLC v. Thanoo*, 999 F. 3d 892, 913-14, n.20 (3d Cir. 2021) (recognizing that "damages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss") (internal quotations omitted). *Cf. FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F. 2d 61, 63 (2d Cir. 1984) (stating that "it is clear that the loss of trade secrets cannot be measured in money damages. A trade secret once lost is, of course, lost forever"); *Advanced Instructional Systems, Inc. v. Compententum USA, Ltd.*, 2015 WL 7575925, at *4 (M.D.N.C. 2015) (stating that courts "presume irreparable harm where a trade secret has been misappropriated").

the franchise agreement entered into by both parties "expressly recognized" that "the unauthorized use or disclosure of such trade secrets, confidential and proprietary information will cause irreparable injury and that damages are not an adequate remedy." *Id.* at \*3-\*4 (internal quotations omitted).

Moreover, Celona agreed that her breach of the Agreement would cause SEA to suffer irreparable harm. Specifically, in addition to acknowledging that she had the opportunity to consult with counsel concerning the Agreement, Celona agreed:

> **<u>REASONABLENESS OF RESTRAINTS, IRREPARABLE HARM</u>**. Employee acknowledges that: a) the agreements and covenants contained herein are reasonably necessary to protect the goodwill, Confidential Information, Trade Secrets, and other business interests of the Company; b) any breach of the covenants contained herein will cause the Company immediate irreparable harm for which injunctive relief would be necessary; c) the covenants contained herein are essential and material elements of this Agreement and the Company would not have entered into this Agreement, hired, continued to employ, and/or promoted Employee without those covenants being included in this Agreement; d) Employee has had the opportunity to consult with and be advised by legal counsel concerning the reasonableness and propriety of the covenants contained herein; and e) in the event of any violation or attempted violation of the covenants contained herein, the Company shall be entitled to a temporary restraining order, temporary or permanent injunctions, and other injunctive relief.

(Verif. Compl., Ex. 1 at ¶ 15).

Accordingly, there is imminent risk that SEA will suffer irreparable harm unless temporary restraints are issued. Celona has already shown deliberate refusal to cooperate with SEA's reasonable (and repeated) requests to return SEA's

Confidential Information and Trade Secrets and unwillingness to be truthful about her employment intentions and/or responsibilities. The foregoing establishes that SEA has suffered irreparable harm.

If temporary restraints and injunction are not issued, it is inevitable that Celona will use or disclose SEA's Trade Secrets and Confidential Information to further compete with SEA in violation of the Agreement, which will cause incalculable harm to SEA's competitive advantage in the marketplace. Given Celona's employment history at SEA in having responsibilities for refrigerators and washing machines, including the recently launched Flagship Combo Product, it is highly likely that she will use SEA stolen Confidential Information and Trade Secrets to benefit her current employer and direct competitor of SEA, Midea. This is particularly so given that Celona is in a similar position that she held at SEA, has similar responsibilities, and has called upon at least one SEA customer. Even if the customer whom Celona solicited is a mutual customer of both SEA and Midea, this is in fact even _more_ concerning because it proves that Celona is working on similar products and customers that she had responsibility during her employment at SEA. As the cases discussed above demonstrate, SEA faces multiple threats of irreparable harm and, accordingly, the requested injunctive relief should be granted.

## POINT III

### AN INJUNCTION WILL NOT HARM CELONA, AND THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF TO PROTECT SEA'S LEGITIMATE BUSINESS INTERESTS AND PROMOTE FAIR COMPETITON

The third and fourth requisite elements favor granting preliminary restraints. The benefit of injunctive relief to SEA far outweighs any detriment to Celona. Where injunctive relief would merely require the defendant to obey existing law and her existing duties and/or contractual obligations, the balance of the hardships favors the employer. *See Manhattan Assocs., Inc. v. Ruderman*, 2005 WL 2290297, at *6 (D.N.J. Sept. 20, 2005) ("the Court concludes that Defendant will not suffer great harm as a result of the grant of a preliminary injunction…. [where] Defendant will simply be precluded from engaging in conduct that he had specifically negotiated and agreed to pursuant to an enforceable [] agreement…").

Here, Celona will suffer no harm as a result of the grant of a preliminary injunction, as she has no right to possess the Trade Secrets and Confidential Information that she currently possesses.  Moreover, any hardship Celona claims is self-inflicted. Under New Jersey law, when an employee voluntarily resigns, any hardship from enforcing a reasonable restrictive covenant is not undue because the employee put herself in the position of bringing the restriction into play. *Community Hospital Group, Inc. v. More*, 183 N.J. 36, 59 (2005).

On the other hand, SEA is suffering, and will continue to suffer, great and irreparable harm due to Celona's unauthorized possession of SEA's Trade Secrets and Confidential Information, as well as her potential use and/or disclosure of those Trade Secrets and Confidential Information. SEA asks only that its information be returned to it. SEA attempted to resolve the matter with Defendant without the use of litigation; however, Defendant's continued refusal to cooperate with SEA caused SEA to seek this Court's assistance. Enforcing Defendant's Confidentiality Agreement with SEA by issuing an injunction will cause Defendant no harm and is consistent with public policy.

Here, the grant of injunctive relief also serves the public interest:

> With regard to the public interest, there is a cognizable interest in "safeguarding fair commercial practices and protecting employers from theft of piracy of trade secrets, confidential information or … knowledge and technique in which the employer may be said to have a proprietary interest."

*Manhattan Assocs.*, 2005 WL 2290297, at *6 (quoting *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999). "Moreover, the public has a great interest in upholding and enforcing freely negotiated reasonable contracts entered into between employees and their employers." *Id.* Additionally, New Jersey's adoption of the New Jersey Trade Secrets Act evidences a public policy of strongly protecting employer trade secrets. Thus, an injunction to enforce the contractual

provisions entered into by SEA and Defendants, and to protect SEA's valuable trade secrets, would serve the public interest.

## POINT IV

## SEA IS ENTITLED TO EXPEDITED DISCOVERY

Good cause exists under Rule 26(d)(1) for targeted, expedited discovery to identify, contain, and remediate the ongoing risk of use and disclosure of SEA's Trade Secrets and Confidential Information. The record shows pre-departure exfiltration to Celona's personal Gmail account and immediate competitive employment (despite her representations that she was not going to a competitor), creating a live threat that relevant stolen information will be used by Celona, transferred to a third party, or modified absent prompt relief. Narrow, front-loaded discovery is, therefore, appropriate to: (i) determine the full scope and paths of misappropriation; (ii) locate and sequester SEA data on Celona's personal accounts/devices and on Midea-issued systems; (iii) obtain information regarding the timing of Celona's search for employment and acceptance of an employment offer with Midea; (iv) obtain information regarding Celona's intended job duties and responsibilities at Midea; and (v) preserve evidence for the preliminary-injunction hearing. *See Lentjes Bischoff GmbH v. Joy Environmental Technologies, Inc*., 986 F. Supp. 183, 188 (S.D.N.Y. 1997).

As detailed in the proposed Temporary Restraining Order, SEA requests that this Court grant expedited discovery as set forth in the Proposed Order to Show Cause with Temporary Restraints, filed herewith.

## CONCLUSION

For the foregoing reasons, SEA respectfully requests that this Court grant BD's request for a seizure order and issue a TRO as proposed.

August 28, 2025

                              Respectfully submitted,

                              /s/ *Daniel R. Levy*
                              Daniel R. Levy, Esquire
                              EPSTEIN BECKER & GREEN, P.C.
                              One Gateway Center
                              Newark, NJ 07102
                              (973) 973-642-1900 (phone)
                              (973) 973-639-8931 (fax)

                              Erik W. Weibust, Esq. (*Pro Hac Vice
                              Application to be Submitted*)
                              Epstein Becker & Green, P.C.
                              One Financial Center, Suite 1520
                              Boston, MA  02111
                              Phone: 617.603.1100 / Fax 617.249.1573
                              E-mail:    eweibust@ebglaw.com

                              *Counsel for Samsung Electronics America,
                              Inc.*